205 N.J. Super. 160 (1985)
500 A.2d 398
STATE OF NEW JERSEY, DEPARTMENT OF HEALTH, PETITIONER-RESPONDENT,
v.
LEAH G. TEGNAZIAN, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 19, 1985.
Decided October 28, 1985.
*163 Before Judges ANTELL, MATTHEWS and SHEBELL.
John P. Palmisano argued the cause for appellant (Andora, Palmisano, Harris & Romano, attorneys; John P. Palmisano of counsel and on the brief and Jonathan N. Harris on the brief).
Vincent J. Rizzo, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel and Vincent J. Rizzo on the brief).
The opinion of the court was delivered by, ANTELL, P.J.A.D.
Before us again for review is this revocation proceeding by the Department of Health against respondent's license as a nursing home administrator. In accordance with our order of remand dated May 11, 1984, reported at 194 N.J. Super. 435 (App.Div. 1984), the matter was referred by the Commissioner of Health to the Administrative Law Judge ("ALJ") "for detailed recommended findings of basic facts in support of his expressed conclusions together with a further statement of the reasoning process by which he reaches his result." See State, Dept. of Health v. Tegnazian, 194 N.J. Super. at 451. On July 3, 1984 the ALJ filed his detailed findings and further statement of reasons in support of his recommendation that disciplinary measures not be taken.
On August 15, 1984 the Acting Commissioner filed for the Department of Health his final decision and order in which he accepted the material factual findings of the ALJ but rejected his recommendation that respondent suffer no sanction beyond *164 a reprimand. Instead, a five year license suspension was imposed, reflecting a modification of the department's earlier penalty of permanent revocation.
The proceedings before us are based on charges that respondent had "committed acts of misconduct in the operation of a nursing home under [her] jurisdiction," in violation of N.J.A.C. 8:34-1.18(7) by abusing certain of the residents of the Home for the Armenian Aged and by violating their rights of privacy. These charges and the evidence relevant thereto were grouped and treated by the ALJ in five separate categories: (1) verbal abuse, (2) physical abuse, (3) privacy invasions, (4) locking a resident in a room with consequent risk to her safety, and (5) soliciting an employee of the home to attest a will she had not actually seen being signed.

VERBAL ABUSE
(1) The ALJ found that on one occasion respondent raised her voice in a conversation with Mr. L.A. He noted that the conversation was in Armenian and that the witness who recounted it did not understand that language. Although both appeared to be speaking in anger, no one other than the witness took note of the incident. Further, L.A. later told the witness that the episode "was nothing."
Observing that merely raising one's voice is not an act of misconduct in context and that L.A. appeared to be untroubled by the event, the ALJ concluded that respondent's actions did not constitute misconduct. The Acting Commissioner took the view that L.A.'s comment that the affair "was nothing" should not be taken at face value. "We do not know how the resident felt ...," the Acting Commissioner held, finding it "difficult to believe from human nature that a person who engages or is drawn into an angry conversation would be left completely unaffected, even though the person may not care to talk about it." He felt that the incident should be "viewed in the context *165 of other similar occurrences as part of a pattern and practice of loud and angry outbursts by Ms. Tegnazian."
(2) The ALJ found that on another occasion respondent rebuked a resident, Ms. J.M. for speaking on the telephone to a social worker named L.S. who had previously visited the Home. Respondent's determination that the residents should have no contact with L.S. arose from a previous incident in which L.S. had induced another resident to squander a relatively large sum of money. Respondent's purpose was to protect J.M. from a similar experience. Although the ALJ was convinced from all the testimony that respondent's actions were well intentioned and caused no ill effects to J.M. and that the incident was of a "distinctly minor nature", the Acting Commissioner felt otherwise. He reasoned that respondent should have realized that the residents under her care are entitled to communicate freely with others and that the incident, rather than being of a minor nature, reflected a "fundamental mis-perception by Ms. Tegnazian of the proper limits of her authority over the private affairs of the residents in the home."
(3) The ALJ found that respondent addressed another resident, J.K., "in an apparently angry manner." He found that J.K. was a troublesome resident, given to swinging his cane at other residents, urinating in the hallway and carrying to his room items of garbage which he collected in the neighborhood. The ALJ observed that he could not determine from the limited evidence on this subject what had precipitated the confrontation. Thus, he was unable to say whether respondent had reacted unreasonably. Although he conjectured that respondent might have shown greater reserve, taking into account that J.K. presented special problems he could not find misconduct. The Acting Commissioner agreed that it was "unclear whether there was cause for reprimanding this resident at the particular time of the incident. There may well have been such cause." But noting that respondent in her testimony had denied acting with anger toward J.K. the Acting Commissioner interpreted her denial as an implied concession that anger is an *166 inappropriate reaction even when dealing with a problem resident. Thus, this incident together with the others, the Acting Commissioner concluded, "shows a serious lack of control over the personal conduct expected of a professional administrator."
(4) The ALJ found that respondent on four or five occasions scolded a resident named Martin for wearing a dirty tie or dirty clothing, and might even have called him a dirty pig. He found further that Martin often wore dissheveled and soiled dress and had to be reminded to change into clean garments. The ALJ found that this "minor insult" was intended to prompt the resident to be more presentable. He felt that the term "pig" was inappropriate, but found that it was used for the purpose of motivating Martin to improve his appearance and therefore did not constitute verbal abuse. The Acting Commissioner found that respondent's treatment of Martin was demeaning and, taken with other incidents, reflected an abuse of authority.
(5) The ALJ found that respondent would sometimes use inappropriate language in trying to motivate certain elderly female residents to engage in group activities. He found that on a few occasions she "may have used such language as `get off your fat ass.'" Expressing the hope that respondent would in the future refrain from the use of intemperate language, he concluded that since it reflected a well intentioned, though tasteless, effort to involve the residents in active pursuits, the facts did not point to misconduct. The Acting Commissioner found that although the language may have been spoken by respondent for a salutary purpose, respondent's manner of address was insulting and improper.
(6) The ALJ found an instance where respondent raised her voice to resident M.M. who came to her office complaining of problems with her teeth. Respondent was upset by the fact that the resident's problem had not been taken care of earlier by the nursing section of the Home and some of her anger spilled over in the direction of M.M. This resident was long suffering from paranoid persecutory and auditory hallucinations. On many occasions in the past she had been taken to a *167 dentist for her complaints and upon examination these were found to be groundless. Respondent "sternly" ordered M.M. to be seated and later took her to a dentist where it was found that on this occasion the woman's complaint was real, not imagined. Although he did not approve respondent's initial reaction when M.M. presented herself at the office, the ALJ concluded that her behavior did not constitute verbal abuse amounting to misconduct.
The Acting Commissioner found that since M.M.'s complaint was well founded respondent's "wholly inappropriate" reaction was "unsettling, suggesting that she cannot control her anger at the time when she knows the residents are in distress to seek her assistance." He again concluded that her reaction in this case was "consistent with a hostile attitude towards many, though not all, residents and patients, demonstrated by her frequent use of derogatory language."
In summarizing the foregoing findings as to verbal abuse, the ALJ concluded that neither singly nor in combination did the respondent's conduct amount to verbal abuse.
At most, the incidents revealed that at times Tegnazian's exasperation and/or frustration would come to the surface. However, in none of the incidents do I perceive any malicious or deliberately malevolent motives. She may appropriately be admonished for venting her feelings. They do not justify any more severe punishment.

PHYSICAL ABUSE
(1) The ALJ found that on one occasion a resident named A.P., came to respondent's office. A.P. was mildly retarded and disposed to inviting attention by positioning herself in an inconvenient location and refusing to move when asked. In this instance respondent asked her to leave the room but A.P. refused. "Accordingly," the ALJ found, "Tegnazian put her hands on A.P.'s back and/or shoulder and physically escorted her out of the room. Tegnazian did not on that occasion angrily push, shove or use excessive physical force against A.P." The Acting Commissioner amended the ALJ's finding by adding that A.P. "was pushed, firmly, albeit not angrily, that *168 she was pushed ten feet across the room and that A.P. was upset at being so physically escorted out of the room when she wanted to speak with Ms. Tegnazian."
(2) The other incident of alleged physical abuse involved the occasion when M.M. came to the office with a complaint about her teeth. Respondent took M.M. either by the arm or shoulder and escorted her to a back office where she was placed in a chair and told to remain there. The ALJ noted that "no excessive physical force was used by Tegnazian either in escorting M.M. to the back office or placing her in the chair."
The ALJ concluded that on neither of these two occasions were the residents handled in any way which "reasonably could have threatened physical harm to either of the residents." He thus concluded that neither case evidenced physical abuse on the part of respondent. The Acting Commissioner, agreeing "that there was no violence or excessive physical force exerted during these two incident (sic)," nevertheless concluded that respondent's behavior went "beyond what was properly warranted in handling these two residents and contributed to their state of personal stress."

INTRUSIONS OF PRIVACY
(1) The ALJ found that respondent would, from time to time, "take it upon herself to throw what she considered to be `junk mail' into the garbage." He noted that the witness to these events said she saw respondent dispose of what appeared to be "personal mail addressed to a resident," but was unable to identify any particular resident whose mail was so discarded. The ALJ was therefore unconvinced that respondent had actually discarded any such personal mail. He also found that it was her practice to read mail to elderly residents who either had poor eyesight or could not understand English. The Acting Commissioner, on the other hand, came to the conclusion that respondent "decided for herself whether personal mail addressed to patients and residents was worth their seeing it, in direct contravention of their rights to receive mail."
*169 (2) The other aspect of the invasion of privacy charge had to do with eavesdropping on conversations. The ALJ found that sometimes respondent did "listen in to conversations taking place outside her office window which she could hear. On most of those occasions, the conversations had to do with newspaper articles that touched upon events which had taken place at the Home and involved Tegnazian herself." In his view, the foregoing actions did not constitute the kind of privacy invasion which would justify serious disciplinary action. The Acting Commissioner concluded that respondent would deliberately stop her work to listen to conversations among residents who were unaware of her presence. He also made "the additional finding that Ms. Tegnazian instructed her staff to eavesdrop on conversations of the residents and to ask them questions while she was in a position to overhear their responses." However, the testimony, according to the ALJ, discloses that only on "one occasion, Tegnazian asked a nurse to engage certain residents in conversation and Tegnazian stood nearby and listened."

IMPROPERLY LOCKING DOOR TO RESIDENTS ROOM
G.B. an elderly resident, occupied a room next to respondent's office. Access to the room could be had by either of two doors, one opening into respondent's office, the other onto a hallway which led up a flight of stairs. The latter route, obviously, was more difficult for G.B.
The ALJ found instances, when a staff or director's meeting was going to be conducted in respondent's office, the door from G.B.'s room to the office was locked. This was done to insure the privacy of meetings in the office. At such times, however, G.B. was told in advance that the door would be locked and that she would either not be able to use it or, if necessary to do so, that she should first knock. It was not suggested in the testimony that the resident was unwillingly confined.
The ALJ found that, under the circumstances, the locking of G.B.'s door "on the few occasions that it did take place" did not *170 rise to the level of misconduct and recommended to the Commissioner that the charge based thereon should be dismissed. The Acting Commissioner, however, went further and found that G.B.'s door was locked, not only when meetings were taking place, but also at other times when respondent believed there was too much traffic passing through the business office. However, the evidence upon which this finding is based was not documented. He also found that respondent had, in conversations with others, alluded to G.B. as a "snake" and an "enemy of the home", thus causing him to "doubt whether G.B.'s door was locked without any malevolent intent."

SOLICITING WITNESS TO WILL
The Administrative Law Judge found that on one occasion respondent solicited an employee of the Home to attest a will even though she had not actually observed its execution. The employee declined to do so and the matter went no further. The ALJ noted that this was a mistake on respondent's part which merited only a minor reprimand. The Acting Commissioner, on the other hand found it "inexcusable."
A major distinction in the analyses made by the ALJ and the Acting Commissioner should be noted. Running through the ALJ's findings and conclusions is a recognition that the proceedings were instigated, not by any offended resident or representative thereof, but by a group of dissident employees whose personal interests would be served by respondent's removal from the Home. The incidents which formed the basis of the charges occurred over a period of time and were recorded by the employees in furtherance of a concerted plan to gather derogatory information about respondent to support charges of misconduct.
In evaluating the charges it was material to determine how and in what way the residents were affected by respondent's allegedly abusive conduct. It appears to us that the ALJ allowed for the fact that he had to decide on the basis of subjective appraisals of the situations by witnesses who were *171 basically antagonistic toward the respondent. Since the focus of the hearings was on the reactions of the residents to respondent's behavior, it is evident that these important findings could be significantly affected by the shading and texture of the testimony more than by the objective factual recitations. As an example, many of the arguments between respondent and the residents were in Armenian, a language unfamiliar to the witnesses. Thus, they reported on the appearance of these incidents without having any idea of what was being said. In some situations where the charge of misconduct is grounded in a claim of shouting at a resident, the question is left open as to whether this was not necessitated by the resident's mental or auditory impairments. The residents themselves did not testify and we therefore do not have the best information about how these incidents affected them.
N.J.A.C. 8:34-1.18, authorizes disciplinary measures "upon substantial evidence that ... such nursing home administrator:... (7). Has committed acts of misconduct in the operation of a nursing home under his jurisdiction." As nursing administrator of the Home for the Armenian Aged respondent was charged with the responsibility of maintaining good order and discipline in the interests of the residents' welfare. Although the residents are all aged, and in many cases suffering from mental and physical infirmities, the fact that on selected occasions respondent may have addressed them in loud or angry tones does not in itself bespeak "misconduct" such as to warrant forfeiture of her livelihood. Although her actions at times exceeded the proprieties, the concept of "misconduct" embodied in the regulation covers behavior proceeding from so willful or reckless a state of mind as, at least, to suggest moral delinquency. Compare, Demech v. Board of Review, 167 N.J. Super. 35, 38 (App.Div. 1979); Beaunit Mills v. Employment Security Div., 43 N.J. Super. 172, 182 (App.Div. 1956), certif. den. 23 N.J. 579 (1957). In summarizing the case this issue was addressed by the ALJ in the following language:
My reconsideration of the testimony convinces me even more that she was, in large measure, the object of a concerted effort by former and present employees *172 who had, for various reasons, an axe to grind against her. That is not to say that she acted in a perfectly acceptable manner all of the time. She did, as noted, improperly solicit someone to witness a will. So, too, she did raise her voice against residents and also may very well have referred to them in derogatory terms in private. She is clearly not a person for and with whom it was easy to work at all times, or under all circumstances. On the other hand, she has devoted a large portion of her adult life to the good and welfare of the Home for the Armenian Aged. She has given it a great deal of attention. She has expressed great affection for the persons under her charge and, in many instances, they have reciprocated the same to her.
What the Acting Commissioner seems to have done is to determine respondent's unfitness for licensure on the aggregate effect of incidents which were carefully selected and orchestrated to present respondent in the worst possible light. Although he expressed his disapproval of respondent's behavior in each of the instances cited, none were individually held to constitute misconduct. Indeed, the Acting Commissioner's comments on the ALJ's findings leave no doubt that the gravity of respondent's actions was found not in single isolated events, but in the fact that they evince a consistent pattern of intemperate behavior incompatible with the duties of a nursing home administrator.
In our view, such an approach requires a broader view of respondent's conduct than what was taken. That respondent may have behaved badly on occasions does not establish that this was the dominant characteristic of her administration. On far more numerous occasions she may have evidenced traits of compassion, understanding and attentiveness to such a degree as to render insignificant her occasional displays of temper, but it does not appear to us that any attempt was made by the Acting Commissioner to weigh the positive aspects of respondent's overall job performance against the negative. In our view this was essential to a fair determination of whether the individual incidents of berating residents should, as the Acting Commissioner found, be "viewed in the context of other similar occurrences as part of a pattern and practice of loud and angry outbursts by Ms. Tegnazian."
The following language of the Supreme Court in Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 92-93 (1973) fixes the standard of appellate review of administrative actions:

*173 Finally, on the matter of the applicable law, the thoroughly established scope of judicial review of administrative adjudications should be briefly noted. As to state agency findings, the role of the appellate court is that of determining "`whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility * * * and * * * with due regard also to the agency's expertise where such expertise is a pertinent factor." Close v. Kordulak Bros., 44 N.J. 589, 599 (1965). The appellate application of this standard requires far more than a perfunctory review; it calls for careful and principled consideration of the agency record and findings in the manner outlined in State v. Johnson, 42 N.J. 146, 161-162 (1964). An appellate tribunal is, however, in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue. As far as review of agency imposed sanctions is concerned, there is no doubt of a court's power of review under the tests of illegality, arbitrariness or abuse of discretion and of its power to impose a lesser or different penalty in appropriate cases.
Further applicable is the following excerpt from State v. Johnson, 42 N.J. 149, 162-163 (1964):
But if the appellate tribunal is thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction (see, e.g., the expressions in Capone v. Norton, 11 N.J. Super. 189, 193-194 (App.Div. 1951), affirmed 8 N.J. 54 (1951); Trusky v. Ford Motor Co., 19 N.J. Super. 100, 103-105 (App. Div. 1952); and Greenfield v. Dusseault, supra (60 N.J. Super. [436] at p. 444)), then, and only then, it should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions. While this feeling of "wrongness" is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can well be said that that which must exist in the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made. This sense of "wrongness" can arise in numerous ways  from manifest lack of inherently credible evidence to support the finding, obvious overlooking or underevaluation of crucial evidence, a clearly unjust result, and many others. This, then, is when and how the permissive power of R.R. 1:5-4(b) should be utilized by the first appellate tribunal and is what our prior cases mean no matter how they have expressed it.
It is clear that at times respondent did not act in accordance with the highest professional standards. Certainly, we can not express our approval of the vernacular which she sometimes employed in speaking to the elderly residents. Yet, standards of propriety are relative where language is concerned, and without knowing something about the idioms of language commonly *174 used and found acceptable by the resident to whom respondent spoke, we can only speculate about how these vulgarisms impacted upon their sensibilities. As we have noted, the residents themselves shed no light on this question in the recorded testimony. But even this is beside the point. The question is not whether respondent is a coarse and insensitive person, but only whether the proofs support a finding of misconduct.
After carefully examining the entire record on appeal we are satisfied that the Acting Commissioner's determination that respondent was guilty of misconduct is lacking in substantial credible evidence, considering the proofs as a whole, and was plainly unwarranted. Parkview Village Ass'n v. Collingswood, 62 N.J. 21, 34 (1972); Close v. Kordulak Bros., 44 N.J. 589, 599 (1965); Jones v. College of Med. & Dent. of N.J., Rutgers, 155 N.J. Super. 232, 240 (App.Div. 1977). While the evidence received on all the charges reflects no credit on respondent, and might even justify termination of her employment, it does not demonstrate misconduct sufficient to merit revocation or suspension of her license.
Reliance was also placed by the Acting Commissioner on N.J.A.C. 8:34-1.18(17), which authorizes disciplinary action "[f]or such other reasons as the (State) board might deem reasonable and appropriate." We find such a determination insupportable since the Acting Commissioner has set forth no reasons in his final decision and order for disciplinary action other than misconduct which, as we have said, has not been shown.
Moreover, we find the sanction imposed under N.J.A.C. 8:34-1.18(17) invalid for the further reason that the regulation is too vague and uncertain for enforcement. Regulations "must be sufficiently definite to inform those subject to them as to what is required." N.J. Ass'n of Health Care Facilities *175 v. Finley, 83 N.J. 67, 82 (1980). They are subject to the same rules of construction and the same constitutional standards as a statute. In Review of Health Care Admin. Bd. v. Finley, 168 N.J. Super. 152, 166 (App.Div. 1979), aff'd 83 N.J. 67 (1980); Essex County Welfare Board v. Klein, 149 N.J. Super. 241, 247 (App.Div. 1977). The first prerequisite of a valid penal enactment is that it adequately inform "those subject to action thereunder as to the conduct which will render them liable to its penalties." Abelson's Inc. v. New Jersey State Board of Optometrists, 5 N.J. 412, 424 (1950); Handelsman v. Div. of, N.J. Real Estate Comm., 101 N.J. Super. 244, 248 (App.Div. 1968); Stern v. Hall, 183 N.J. Super. 536, 540 (Law Div. 1982). In the foregoing regulation nothing is provided for the guidance of licensees other than the wholly subjective standard of what the Nursing Home Administrators Licensing Board "might deem reasonable and appropriate."
Reversed.