643 A.2d 1029

IN THE MATTER OF THE PETITION OF THE BOARD OF EDU-
CATION OF THE TOWNSHIP OF WAYNE, PETITIONER–RE-
SPONDENT, v. ARLENE KRAFT, JOHN AND ANGELA
O'KEEFE, WARREN AND JUNE BROOKS, PATRICK AND
ROSEANN MORIARITY, DR. DOUGLAS AND MRS. STEPHA-
NIE GLAZER, RICHARD AND APPY EDEN, FRANK AND
CHRISTINE DEGARCIA, MR. AND MRS. ROLAND TULINO,
MARC AND LINDA FISHMAN, GEORGE AND CARLA FATTAL,
STEVE AND MARY POTTER, MR. AND MRS. CHRISTOPHER
MARRA, ALAN AND SANDY BURTON, MR. AND MRS. WAYNE
R. REPPA, DR. AND MRS. ALAN TELL, DAVID GOLUB, JO-
SEPH AND FONG–JIAO CHEN, MICHAEL W. AND PATRICIA
A. LAVULLO, RESPONDENTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Submitted March 23, 1994—Decided June 2, 1994.

Before Judges SHEBELL, LONG and LANDAU.

*Charles J. Mysak,* attorney for appellant.

*Fogarty & Hara,* attorneys for respondent (*Ellen Marie Walsh,* of counsel and on the brief).

*Deborah T. Poritz,* Attorney General, filed a statement in lieu of brief on behalf of respondent (*David Earle Powers,* Deputy Attorney General, on the statement).

The opinion of the court was delivered by

LONG, J.A.D.

This is an appeal from a determination of the State Board of Education which affirmed a decision of the Commissioner of Education that a walkway, denominated the "Smith Lane extension walkway," was appropriately used by respondent, Board of Education of the Township of Wayne (Board), in determining whether certain pupils were eligible for mandatory free pupil transportation. *See N.J.S.A.* 18A:39–1; *N.J.A.C.* 6:21–1.3.[1] Appellants are the parents of pupils affected by the decision. They claim that the Smith Lane extension walkway is a private road which may not be used for purposes of measuring remoteness for pupil transportation. We have carefully reviewed this record in light of this contention and have concluded that our intervention is warranted. We reverse.

*I*

Appellants are the parents of school age children who reside in Wayne Township. Prior to 1988, students who resided in their neighborhood attended George Washington Middle School which was approximately four tenths of a mile from each of their homes. In 1988, under a new policy, these students were reassigned to the Schuyler–Colfax Middle School. Representations were made to the families of these children that they would be bused to the new school, and in 1988 and 1989, they were bused. However, on August 31, 1990, Erik Ernst, Business Administrator of the school district, sent a letter to each of the parents advising them of a determination of their entitlement to transportation. The letter stated that an error had been made

[r]esulting in the issuance of a bus pass to your child, this error has been verified through actual walking of the area with a certified measurement wheel. The

---

[1] *N.J.S.A.* 18A:39–1 provides that wherever elementary pupils live more than two miles (and secondary pupils two and a half miles) from the school which they attend the local district must provide transportation. *N.J.A.C.* 6:21–1.3 sets forth standards for determining remoteness for the purpose of transporting pupils to and from school.

distance from your residence to your child's school is under two miles. Therefore, your child is ineligible for transportation. We apologize for any inconvenience this may cause you, however, we are required to apply the State's definition of remote equitably to all Township residents.

This error occurred because the locator code corresponding to these people's homes was put into the computer incorrectly and therefore reflected that these homes were a half mile from their actual location. In addition, in determining that the children lived less than two miles from Schuyler–Colfax Middle School, the Board used the Smith Lane extension walkway in its measurement.

The Board then filed a petition for declaratory judgment with the Commissioner of Education concerning the application of *N.J.S.A.* 18A:39–1 and *N.J.A.C.* 6:21–1.3 to the question of whether the Smith Lane extension walkway constitutes a public walkway for remoteness purposes in connection with pupil transportation. The Board's request for a declaratory judgment was based upon the following provision of *N.J.S.A.* 18A:39–1:

[w]henever in any district there are pupils residing *remote* from any schoolhouse, the board of education of the district may make rules and contracts for the transportation of such pupils to and from school, including the transportation of school pupils to and from school other than a public school, except such school as is operated for profit in whole or in part.[2]

"Remote" is defined in *N.J.A.C.* 6:21–1.3 as follows:

(a) The words "remote from the schoolhouse" shall mean beyond 2½ miles for high school pupils (grades 9 through 12) and beyond two miles for elementary pupils (grades kindergarten through eight), except for educationally handicapped pupils.
(b) For the purpose of determining remoteness in connection with pupil transportation, measurement shall be made by the shortest route along public roadways or public walkways from the entrance of the pupil's residence nearest such public roadway or public walkway to the nearest public entrance of the assigned school.

---

[2] *N.J.S.A.* 18A:39–1 was amended by *L.*1990, *c.* 52, § 50, but the change does not affect this case. The relevant portion of *N.J.S.A.* 18A:39–1 now provides as follows:

[w]henever in any district there are elementary school pupils who live more than two miles from their public school of attendance or secondary school pupils who live more than 2½ miles from their public school of attendance, the district shall provide transportation to and from school for these pupils.

If the Smith Lane extension walkway constituted a public walkway, then the Board was entitled to include it when determining the shortest route between the children's homes and the Schuyler–Colfax Middle School. If the Smith Lane extension walkway could not be used for the purpose of measuring remoteness, then the route would have been more than two miles and the Board would have been required to provide transportation for approximately eighty-nine affected students.

A hearing on the matter was held on September 20, 1991 before an administrative law judge (ALJ) to whom the case had been referred. At the hearing, Gary Peatick, the Transportation Supervisor of the Wayne School District, testified. It was his responsibility to determine remoteness for transportation purposes. Peatick located Smith Lane on the official map of the Township, and noted that the walkway portion of Smith Lane is not identified on the map. He stated that the subject walkway begins at the driveway of Theunis Day School and extends along a baseball field to Smith Lane. Peatick described the walkway as:

approximately five to six feet wide, paved. There's foliage on both sides of the walkway. As you walk up the walkway, on your left, there's a fence leading to the back yards [of residences], on the right, there's the Theunis Day Baseball Field. The walkway is sloped, it's up a hill. And partially up the walkway, you encounter the night security lighting system for the Theunis Day School.

According to Peatick, the path is approximately 500 feet long.

Peatick testified that the Township of Wayne is responsible for maintenance of the walkway, which includes paving and snow and ice removal. Peatick has never received a complaint relating to snow and ice on the walkway.

In Peatick's opinion, the Smith Lane extension walkway is a safe walkway. It has no breaks in it, no potholes, is not littered with debris, and the slope is not too steep. Approximately eighty students use the walkway to get from their homes to school and other children use it for recreational purposes such as coming and going to friends' houses. There is a dusk to dawn lighting system at the Theunis Day School which illuminates the walkway, and that lighting system is the responsibility of the Board to maintain.

Peatick stated that students generally can be seen when they are on the walkway by a traffic guard on Jackson Avenue. There is a wooded area that is secluded from public view, but it measures only forty to fifty feet. Peatick has never seen bottles on the walkway, but he has seen soda cans. He has never seen teenagers using the walkway to drink alcoholic beverages, but believes that people "hang out" there sometimes.

On cross-examination, Peatick acknowledged that he received a written communication from the Township of Wayne that the Smith Lane extension walkway was not designated a public right-of-way. He stated that Smith Lane, as it extends off Whipple Street, is identified as a public roadway on the map but that the remainder of Smith Lane, past Whipple Street, is a private road. Peatick estimated that approximately 150 feet is private road. There is a "local traffic only" sign on Smith Lane. The sign, posted by the Township, is there, in Peatick's opinion, to limit traffic because Smith Lane is a narrow, winding road. Although Smith Lane is a private road, the Township maintains that road to the same extent that it maintains its other roads.

At this point, the attorney for the parents argued that at the end of the walkway, Smith Lane is a private road. The attorney for the Board countered that the issue was whether the walkway is a public walkway which can be used for measurement, and not whether Smith Lane is a private road. He stipulated that the map identifies Smith Lane, at this area, as a private road. When determining that the affected students lived less than two miles from school, Peatick included the driveway of the Theunis Day School in measuring the distance.

Erik Ernst, the Assistant Transportation Supervisor for the Wayne Board of Education, testified that the Smith Lane extension walkway is "a paved asphalt pathway, it resembles the sidewalk that doesn't run alongside a road, that is by itself, it's wooded on both sides. As you come from Smith Lane down towards Theunis Day School, there's a small grade. As it gets closer to the school, the foliage pulls away from it on both sides

and it terminates in the Theunis Day driveway." He testified that he had seen children using it as a path to school and for recreational purposes and considers it safe. Ernst stated that there are crossing guards at Webster Avenue and Jackson Avenue who would hear childrens' voices on the walkway calling for help if a child were in distress and that the Township Department of Public Works is responsible for clearing snow on the walkway.

Marilyn Mysak, a resident of Webster Drive, also testified. Webster Drive is directly adjacent to the Smith Lane extension walkway. Ms. Mysak is the wife of the attorney for the parents. The Mysaks' two children do not use the walkway and would not be affected by the outcome of this case. Ms. Mysak testified that she lives one house away from Theunis Day School. She described debris, such as tires, on the walkway. She also noticed cans used to set off "cherry bombs" on the walkway and has very often heard the cherry bombs go off in that area. She described a secluded, wooded area of the walkway where a child could not be seen if he or she needed help. Ms. Mysak also stated that she had seen beer bottles and cans along the path and has observed seeing people sitting there and drinking.

Ms. Mysak further testified that she observed leaves on the walkway and noticed that in the fall, if it is wet, the walkway, especially at the slope, can be very slippery. She also noted that the crossing guard at Theunis Day School does not come on duty until after the children using the walkway to get to Schuyler–Colfax Middle School are already at school. She has observed children fighting on the walkway and said that the principal of Theunis, when standing outside, has not heard the fighting. There are no safety personnel on the walkway. The walkway bends and no one can see a child or readily get to a child in trouble because there is a fence along yards behind the houses. There is broken glass along the side of the walkway and the terrain drops to "gullies" where there are rocks. Ms. Mysak stated that she believed the lights at Theunis Day School shine on the school, and not onto the secluded area of the pathway. She

also noted that it is dark even in the middle of the day on the walkway and that she has seen bicycles traveling at a high rate of speed along the walkway. She has had to call the police in the early evening when she has heard explosions going off and vehicles along the walkway. Ms. Mysak stated that the walkway is not particularly well maintained. There is grass growing along it, ice on it in the winter, and leaves on it that make it slippery in the fall. The Mysaks' house is one house from the walkway, which is a distance of approximately 150 feet. Thus, she hears children shouting and laughing on the walkway.

Introduced into evidence at the hearing was a certification by Thomas Huff, a former assistant superintendent of the Wayne School District. He certified that the walkway was not historically used to determine remoteness and, in his opinion, should not be used at this time. At the time the plan was proposed, he condemned the use of the walkway to measure remoteness as a change of policy on the part of the Board.

On November 18, 1991, the ALJ issued an initial decision. She found that the Smith Lane extension walkway is paved and maintained by the Township; because the walkway is designated as a private road on the map, the ALJ concluded that ownership of the land under the walkway could not be determined from the evidence. She found that whatever the actual ownership of the land, it is subject to permanent unrestricted use by the public. She also noted that Smith Lane is designated on the official map as a public roadway.

The ALJ discounted the concerns raised by Ms. Mysak at the hearing. She noted that Ms. Mysak testified to the occasional existence of debris. The ALJ interpreted this as an indication that someone had maintained and cleaned the walkway in between her visits. In response to Ms. Mysak's testimony to the steep grade and gullies and crevices on the sides of the path, the ALJ stated that both Ernst and Peatick testified as to no dangerous conditions. She also noted that the existence of a slope does not make a sidewalk on a main thoroughfare unsafe. The ALJ stated

that Ms. Mysak expressed concerns that the childrens' cries for help if they were in distress could not be heard, but yet Ms. Mysak herself heard the children on the walkway. She also discounted Ms. Mysak's concern that older children "hang out" on the walkway and drink by stating that this behavior occurs well after school hours. Finally, the ALJ rejected Ms. Mysak's assertion that the walkway is not regularly patrolled by school guards, by noting that no public road is regularly patrolled except to protect children from motor vehicles, and that is not necessary here because there are no motor vehicles on the walkway.

The ALJ gave little weight to the certification of Thomas Huff. She wrote "[t]here is no reason that a board may not change its policy to accommodate the needs of the school district it administers."

The ALJ concluded that the Smith Lane extension walkway is a public walkway. She explained her reasons for this finding:

[i]t is used freely by the public except that it is closed to vehicular traffic. There is evidence of its status as a public easement in the deeds of the private landowners whose property abuts the walkway and it is maintained by the Township of Wayne as if it were a public walkway; respondents' concerns as to the existence of debris on the walkway, the lighting of the walkway, or the maintenance of the walkway should be addressed to the Township of Wayne, which has assumed the responsibility for its condition.

She concluded that "Smith Lane is a public street no matter what the sign at its entrance may say, and it is so designated on the official map of Wayne Township." She determined that "[t]here is no additional risk to which the children are exposed by using the Smith Lane extension walkway than they would meet on any public roadway or walkway in the Township."

On January 2, 1992, the Commissioner of Education affirmed the decision of the ALJ for the reasons expressed by her. The Commissioner agreed with the ALJ that the Smith Lane extension walkway is designated as a private road, and Smith Lane is designated as a public road and that even though a sign is posted at Smith Lane indicating that it is a private road, it is a public thoroughfare, paved and painted with traffic lines by the Town-

ship. The Commissioner adopted the assessment of Peatick and Ernst at the hearing that:

> the walkway … is as safe and well-maintained as any other public sidewalk in Wayne Township, that it is maintained by the Township, which also removes snow and ice from it, and that the Board of Education provides security lamps on the elementary school which illuminate the walkway from dusk to dawn, albeit that student use is primarily during the day.

The Commissioner also rejected the parents' argument that the Theunis Day School driveway was improperly included in the remoteness calculation. He found that it was correct for the Board to use the Theunis Day Elementary School driveway as part of the measurement in determining eligibility for school busing under *Nelson v. McCaffrey*, 1990 *S.L.D.* 532 (Initial Decision 1990), *aff'd*, 1990 *S.L.D.* 539, (Comm'r of Educ.), *aff'd*, 1990 *S.L.D.* 542 (State Board of Educ. 1990), *aff'd*, 246 *N.J.Super.* 467, 587 *A.*2d 1327 (App.Div.1991). The State Board of Education affirmed the decision of the Commissioner and this appeal ensued.

## II

The ALJ, the Commissioner of Education, and the State Board of Education all agreed that Smith Lane was a public roadway and that the Smith Lane extension walkway was a public walkway for purposes of measuring remoteness within the meaning of *N.J.A.C.* 6:21–1.3(b). In reaching this conclusion, they relied on prior school law decisions which discussed the meaning of the term "public" in the remoteness calculation context. In *Nelson,* 1990 *S.L.D.* 532, the parent of a student attending the Delbarton School in Morristown sought payment for transportation to the school from their house in Glen Ridge. *Id.* at 534. Under *N.J.S.A.* 18A:39–1, if a school district provides transportation for public school children living remote from any schoolhouse, it must also supply students transportation to and from any remote nonprofit private or parochial school "located within the State not more than 20 miles from the residence of the pupil." Delbarton, located off of Route 24, has a paved two lane driveway approximately eight tenths of a mile in length. If Glen Ridge included the driveway in

the measurement, the distance was greater than twenty miles and the Nelsons would not be entitled to payment. If the driveway was not included, the distance was less than twenty miles and the parent would be entitled to payment. Notwithstanding the facts that the driveway was located on property owned by the school, was constructed by and maintained by the school, had a steel gate at Route 24 that was occasionally locked, that snow removal was conducted by the school, that a posted sign warned that the area was private property and that public access to the driveway was limited to those with legitimate dealings with the school, the ALJ found that the driveway could be included in the measurement. *Nelson*, 1990 *S.L.D.* at 534–36.

What obviously was intended by use of the adjective "public" in the regulation was to prevent school boards from depriving students of rightful transportation by forcing them to trespass across neighbors' yards or take shortcuts through back alleys, empty fields and lonely forests in order to shorten the distance to school. Nothing suggests that the proscription was ever meant to extend to situations such as the present one, where a paved two-lane roadway, open to vehicular traffic, is regularly used by students and teachers alike to gain access to otherwise land-locked school buildings.

[*Id.* at 537.]

The ALJ rejected the parents' argument that the driveway at the Delbarton School is "private" as "hypertechnical and legalistic" and instead favored a "common sense and practical approach" to interpreting the meaning of "public roadways or walkways" in the regulation. *Id.* at 536.

The ALJ's Initial Decision in *Nelson* was affirmed by the Commissioner of Education. 1990 *S.L.D.* 539. The Commissioner added that the distance should be measured from the door of the pupil's home to the nearest entrance to the school building. *Id.* at 540. The Commissioner explained:

[i]ts use of the word "public" cannot be construed as an attempt to differentiate public property from private strictly in terms of ownership, as such a distinction would be irrelevant for purposes of measuring transportation distances for the public school pupils to whom the regulation was drafted to apply. Rather, the term is plainly meant to apply to commonality and habitualness of usage for purposes of pupil safety.

[*Ibid.*]

The Commissioner stated that "the fact that the paved, two-lane roadway by which students and vehicles regularly access Delbarton school buildings is owned and maintained by the school rather than by a public entity *is of no import whatsoever.*" *Ibid.* (emphasis added.)

We affirmed the decision of the Commissioner of Education which had also been affirmed by the State Board. 246 *N.J.Super.* 467, 587 *A.*2d 1327 (App.Div.1991). In so doing, we noted that the .84–mile private driveway should be included in the remoteness calculation because "[t]he distance between the pupil's residence and the school building includes but is not limited to the distance along the public way." *Id.* at 471, 587 *A.*2d 1327.

Likewise in *Mangieri v. Board of Education,* 1991 *S.L.D.* 69 (Comm'r of Educ. 1991), the Commissioner again addressed the subject of what property is public for remoteness calculation purposes. There, the Commissioner held that a newly created pedestrian crossing over railroad tracks was a public walkway within the meaning of *N.J.A.C.* 6:21–1.3(b) and could be used to measure remoteness from a schoolhouse. *Mangieri,* 1991 *S.L.D.* at 71, 72. Conrail owned the railroad tracks and granted the school district an easement across them. *Mangieri v. Board of Educ.,* 1991 *S.L.D.* 58, 60–61 (Initial Decision 1990). The easement was subject to the condition that the crossing was "for pedestrian use only" and it was to be "open only during the hours the school is operated." *Mangieri,* 1991 *S.L.D.* at 61. The school district was required to provide a crossing guard and "an appropriate lock-type gate" which was to be kept locked whenever the crossing was not in use. *Ibid.*

In affirming the initial decision, the Commissioner explained what would constitute "public" as follows: "[p]ublic" for purposes of 6.21–1.3(b) *refers not strictly to ownership, but to commonality of usage, freedom of access* and reasonable expectation of safe passage under the auspices of a responsible government entity." *Mangieri,* 1991 *S.L.D.* at 72 (emphasis added). The Commission-

er described the railroad crossing as "open to any person desiring access to school property at any time when that property is open to lawful use; its physical construction is sturdy and permanent; its maintenance and safe operation are the responsibility of the borough and school district." *Ibid.* The Commissioner continued: "[p]hotos ... show it to be plainly marked, unobstructed and free of any hint of the isolation and the other potential safety risks that led to rejection of the park pathways in (an earlier case)." *Ibid.* The Commissioner concluded, "[i]n sum, there is nothing about the disputed crossing that would preclude its acceptance as a lawful means of providing convenience of access to the school building." *Ibid.* The fact that the railroad crossing was privately owned by Conrail did not affect the Commissioner's decision as to the public nature of it. He stated, "[n]or does the fact that *actual ownership of a portion of the property over which the walkway passes is private, in itself, render the thoroughfare any less public under the circumstances of this case." Ibid.* (emphasis added). Thus, it is clear that the fact that the relevant portion of Smith Lane and the Smith Lane extension walkway are private, does not in itself render these thoroughfares "not public" for purposes of determining remoteness within the meaning of the regulation.

There is a second prong to the inquiry. "Public" for purposes of 6.21–1.3(b) requires "reasonable expectation of *safe passage* under the auspices of a responsible government entity." *Ibid.* (emphasis added.) Indeed, the lawful use of the pedestrian railroad crossing as a public walkway in *Mangieri* was conditioned upon the following safety measures: the crossing was "for pedestrian use only," was only open during school hours, was monitored by a crossing guard, and had a gate that was kept locked when the crossing was not in use. *Mangieri,* 1990 *S.L.D.* at 61. Under these conditions, the railroad crossing appeared to be, and actually was, overseen by a responsible government entity.

■ Here, Peatick and Ernst testified that the Township removes debris from the Smith Lane extension walkway, paves it and removes snow and ice. Notwithstanding Ms. Mysak's testi-

mony to the contrary, the Commissioner was free to accept this evidence as true. This falls far short, however, of the provision of "safe passage under the auspices of a responsible government entity." It is uncontroverted that no district employee is responsible for the safety of the Smith Lane extension walkway which, all the evidence in the record establishes, is isolated and includes a wooded area secluded from public view.

The Board argues that the children using the walkway are not in danger due to isolation because Ms. Mysak acknowledged that she could hear them from the backyard of her home. Ms. Mysak is not a responsible government entity. Further, it is conceded that there is a fence between the houses adjacent to the walkway and the walkway itself which would hinder the rendering of aid to a child in distress. Moreover, the happenstance of a neighbor being at home to hear a child cry out and render aid is insufficiently reliable to constitute the provision of safe passage. The crossing guard located on Jackson Avenue whom the Board argued "could" hear a child in distress is not adequate under *Mangieri*, 1991 *S.L.D.* at 72.

The Commissioner adopted the ALJ's rejection of the assertion of a need for a guard by noting that no public road is regularly patrolled except to protect children from motor vehicles, and that such is not necessary here because there are no motor vehicles on the walkway. This begs the question. This walkway is isolated and it is the isolation and not traffic which requires the additional protection that a public road would not need. It is simply incorrect in these circumstances to suggest as did the ALJ and the Commissioner that "[t]here is no additional risk to which the children are exposed by using the Smith Lane extension walkway than they would meet on any public roadway or walkway in the Township."

That a guard on duty at another street *may* hear the cries of a child in distress, and that a neighbor along the route *may* hear a child in distress are matters of chance. They do not add up to providing a "safe passage under the auspices of a responsible

government entity." *Mangieri,* 1991 *S.L.D.* at 72. Removal of snow and ice and occasional removal of debris, while demonstrating routine maintenance by the Township, does not protect against the harm that might result to children using the isolated portion of the walkway.

Indeed, in *Mangieri,* the Commissioner himself recognized this standard when he noted that the pedestrian crossing over the railroad tracks could lawfully be included in measuring remoteness to school because photos showed it to be "unobstructed and free of any hint of . . . *isolation* and . . . other potential safety risks." *Ibid.* (emphasis added).

In *Board of Education v. Bailey,* 1984 *S.L.D.* 1162, 1164 (Comm'r of Educ.), *aff'd,* 1984 *S.L.D.* 1165, 1166 (State Board of Educ. 1984), the Commissioner found, and the State Board affirmed, that walkways through a public park could not be used for measuring remoteness for school transportation purposes. The Commissioner noted that there were no existing public roadways into the park open to vehicular traffic. *Bailey,* 1984 *SLD* at 1164. He concluded that the footpaths and trails could not be considered to constitute walkways so as to comply with the intent of the provisions of *N.J.A.C.* 6:21–1.3(b). *Ibid.* The State Board of Education agreed with the Commissioner that the pathways through the park did not constitute walkways within the meaning of the regulation and also noted that permitting paths in the park to be used for determining remoteness would increase danger to children, thus contradicting the statutory intent of *N.J.S.A.* 18A:39–1, which is to promote the safety of children. *Mangieri,* 1984 *S.L.D.* at 1166.

The Commissioner attempted to distinguish *Bailey* on these grounds: there, snow and ice were not removed, no public thoroughfare linked the pathways in the park to the rest of the community, and the park was in an urban area, creating a potential danger of attack. These distinctions misconceive the State Board's decision in *Bailey.* Although affirming the Commissioner, the State Board decided the case based on the ground that:

permitting the footpaths and trails through the park to be used for purposes of determining remoteness would·be tantamount to requiring the students to walk through the park when going to and from school. This would impose on them an increased risk of molestation and other threats to the safety of their persons.

[*Bailey,* 1984 *S.L.D.* at 1166.]

Nothing in the State Board's decision suggests reliance on lack of snow and ice removal, lack of public thoroughfare linkage or a distinction between urban and suburban isolated pathways. *Bailey* squarely interdicts requiring children to be subject to the danger of traversing isolated footpaths. Safety is the touchstone of the analysis because the purpose behind *N.J.S.A.* 18A:39–1 is the safety and welfare of the children. *See Board of Educ. v. Gateway Reg. High Sch. Dist.,* 104 *N.J.Super.* 76, 86, 248 *A.2d* 564 (Law Div.1968) (explaining that the legislative purpose is to guard children "against the hazards attendant upon travelling to school"). As the ALJ in *Nelson* aptly observed, and the Commissioner approved, the following would not appropriately be used to measure remoteness: neighbors' yards and "shortcuts through back alleys, empty fields and lonely forests in order to shorten the distance to school." *Nelson,* 1990 *S.L.D.* at 537. The two lane paved roadway in *Nelson* is very different from the Smith Lane extension walkway, which more closely resembles the interdicted park pathways in *Fair Lawn.*

We thus conclude that the decision below is correct insofar as it holds that private roads may be used for the purpose of measuring remoteness in connection with pupil transportation. Actual ownership is not the deciding factor and commonality and habitualness of usage may also be considered. Thus, the decision to include Smith Lane as a "public roadway" for purposes of measuring remoteness was proper. However, the decision to include the Smith Lane extension walkway as a "public walkway" was not correct for safety reasons.

In reaching these conclusions, we are mindful of the deference ordinarily accorded administrative agency decisions. *Mayflower Sec. v. Bureau of Sec.,* 64 *N.J.* 85, 92–93, 312 *A.2d* 497

(1973) and *Department of Health v. Tegnazian,* 205 *N.J.Super.* 160, 173, 500 *A.*2d 398 (App.Div.1985). We are equally cognizant, however, of our duty to intervene in a case in which we are thoroughly satisfied that the finding is clearly a mistaken one and plainly unwarranted. In such a case, the interests of justice compel our intervention and correction. *State v. Johnson,* 42 *N.J.* 146, 162–63, 199 *A.*2d 809 (1964) and *Tegnazian,* 205 *N.J.Super.* at 173, 500 *A.*2d 398. Here, the decision of the agency is entirely inconsistent with its long-standing common sense position that isolated pathways should not be utilized for determining remoteness for safety reasons and that children are entitled to safe passage under the auspices of a responsible government entity.

More importantly, it undercuts the very rationale behind the pupil transportation statute which is to advance the safety and welfare of children as they travel to and from school. Under the circumstances, it is clear to us that the decision under review was so wide of the mark that our intervention is required.

This conclusion makes it unnecessary for us to address appellants' additional claim that the Theunis Day Elementary School driveway was improperly utilized as a part of the measurement to determine eligibility for school busing.

Reversed and remanded for a remoteness recalculation in light of the principles to which we have adverted.