689 A.2d 793

WILLIAM RIDLEY, PLAINTIFF–RESPONDENT, v. JOANNE
P. DENNISON, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 20, 1997—Decided March 7, 1997.

374

Before Judges SHEBELL and PAUL G. LEVY.

*Joanne P. Dennison*, appellant *pro se*, argued the cause.

*Lucie Sterling*, argued the cause for respondent.

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

Defendant, Joanne P. Dennison, formerly Ridley, appeals from orders of the Family Part dated February 20, 1996 and March 29, 1996 and questions the validity of the fines and fees imposed, the appointment of a guardian for her children, and the visitation terms ordered by the court. She argues that not only are the sanctions excessive, but that there is no factual information in the judge's opinion to warrant the penalties and fees and that there are no facts to demonstrate recalcitrant behavior on her part,

since she encouraged the children and made efforts to comply with the previous court orders pertaining to visitation, including the trip to Germany ordered by the court. We reverse the orders under review, set aside the penalties and counsel fees imposed, and remand for further proceedings.

The published opinion of the Family Part judge begins by stating the obvious—"[t]his case presents difficult issues concerning enforcement of court orders mandating visitation by a non-custodial parent with the children born of the marriage." *Ridley v. Ridley,* 290 *N.J.Super.* 152, 154, 675 *A.*2d 249 (Ch.Div.1996). The judge then notes that plaintiff, William J. Ridley, has not seen his three children since 1988, and refers to plaintiff's alleged "consistent efforts to effectuate visitation." *Ibid.*

The record reflects, however, that in 1989, despite a scheduled hearing to determine the visitation issue, plaintiff instructed his attorney "to dismiss any pending claims he has with regard to custody and visitation of the children." This decision of the plaintiff closely followed the filing of a custody and visitation report by the Monmouth County Probation Department, which recounted allegations that plaintiff had serious alcohol problems, perhaps related to stress stemming from his Vietnam experiences, that he was frequently violent when intoxicated, that he had assaulted defendant and thrown her across the room, and that when he came for visitation with the children in early 1985, he became violent and hostile, reportedly breaking through a storm door to enter the house and breaking into the locked bathroom where the three children were hiding out of fear.

Defendant related to the probation department that because plaintiff forcibly took the children for their weekend visits, they were uncomfortable, stressed and unhappy when they stayed with their father. The children, according to the report, "related numerous stories and problems when they visit their father" and specifically, referred to him leaving them alone in hotel rooms while he went to bars or out shopping for extended periods of

time, and that he would either not show up or be irresponsible towards the children when he did have them.

The probation department conducted numerous interviews with school authorities, police, and persons in the community to obtain their impressions of the family and the circumstances pertinent to a proper disposition of the visitation and custody issues. The report relates that "[a]ll three children have stated they have fears and misgivings towards their father" which the report stresses "should not be overlooked by the Court." The report further recommends alcohol abuse evaluation for the plaintiff, and emphasized that allegations came not only from defendant and the children, "but from other sources as well." A psychological assessment of the three children was also carried out prior to plaintiff's withdrawing of his request for custody and visitation of the children. It is notable that the psychologist reported that although he requested a consultation with the father, the father never called for an appointment.

In any event, the Family Part judge held a hearing on September 6, 1995 regarding the failure of the children to comply with a court order that they visit their father in Germany, even though they had not seen him since 1988. The father and children did not even recognize each other at this hearing because of the long separation. Testimony was received from the plaintiff and defendant, as well as from two of their three children, Michael, born May 10, 1976, and Michele, born March 13, 1978. Marielle, born April 15, 1982, did not testify, as it was represented there was little that she could add to the testimony of her two siblings.

The hearing was concluded that same day, however, the opinion of the judge outlining his sanctions and orders was not filed until January 26, 1996. In open court, after hearing the testimony, the judge immediately made known his reasoning that:

A logical conclusion is that Mrs. Dennison through the years was doing her share of badmouthing, so to speak, her former husband. I do believe that is what happened, I do believe that is where all this trouble has started. And now it has

grown to such an extent that the children say, well we don't want to visit with our father unless it is under very controlled circumstances.

The judge further stated:

It is my conclusion, especially after hearing the children, that Mrs. Dennison has been in there pitching so to speak, against their father, against visitation with Mr. Ridley. I do believe that it is infectious. I think that is what—there is a whole attitude and a whole feeling, on the children's part that a reapproachment and a relationship at this stage may very well be extremely difficult. It may almost be impossible to achieve.

In his opinion of January 26, 1996, the judge notes that the two children and the defendant "reiterat[ed] in very much similar language that defendant was not at fault nor to blame for the children's refusal to visit." *Ridley, supra,* 290 *N.J.Super.* at 157, 675 *A.*2d 249. The judge continued: "[b]y way of contrast, the two children seem to hold plaintiff responsible for every problem that now confronts them." *Ibid.* The judge stated that the positions taken by the children were "internally contradictory and often at variance with both the facts and common sense." *Ibid.* He found that the protestations of defendant and the two children "lack credibility," and ended his findings by stating "[c]learly, it is defendant who has, by overt and covert means, influenced the children, resulting in the present estrangement between plaintiff and his three children." *Ibid.* We find no basis in the record for his conclusions.

Ordinarily, we will not weigh the evidence anew, rather we merely determine whether the evidence supports the findings and determination of the trial judge. *State v. Johnson,* 42 *N.J.* 146, 157, 199 *A.*2d 809 (1964) (citing *State v. Joas,* 34 *N.J.* 179, 184, 168 *A.*2d 27 (1961)). This court does, however, have the power "to review the fact determinations of a trial court in all cases heard without a jury and to make new or amended findings." *Id.* at 158, 199 *A.*2d 809. (citations omitted). We first "determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." *Id.* at 162, 199 *A.*2d 809. If, in fact, such is the case, we may not disturb the result even though we might have reached a different conclusion than that of the trial judge. *Ibid.* However, where we are

"thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction (citations omitted), then, and only then," we will undertake our own findings and conclusions. *Ibid.* We are instructed in *Johnson, supra,* that "[t]his sense of 'wrongness' can arise in numerous ways—from manifest lack of inherently credible evidence to support the finding, obvious overlooking or underevaluation of crucial evidence, a clearly unjust result, and many others." *Ibid.*

■ Our careful review of the entire record satisfies us that, considering the proofs as a whole, the determination of the Family Part judge is not supported by substantial credible evidence and was plainly mistaken and unwarranted. *See State, Department of Health v. Tegnazian,* 205 *N.J.Super.* 160, 174, 500 *A.*2d 398 (App.Div.1985). We first note that there are no facts in the record upon which the judge could arrive at what he calls a "logical conclusion" that defendant was badmouthing her former husband and that the attitude of the children was as a result of her "pitching" against their father and visitation, which he termed "infectious." The testimony of the defendant and the children was to the contrary. The judge's rejection of their credibility, even if it were warranted, does not fill the void of the lack of proof to the contrary. Further, viewed in light of the evidence in the record, we do not find any compelling logic in his conclusions that the fears of the children were without cause.

We turn to plaintiff's own testimony regarding the incident when Marielle, the youngest child, was returned from visitation by her father in such a state that she collapsed in her mother's arms and reportedly almost died after going into a partial coma at the hospital suffering from meningitis. The judge concluded that this incident had continued to be one of which the children had a vivid memory, causing them to resist visitation despite the passage of time. The judge found it particularly telling and laid the blame for the continued survival of that memory at the feet of the defendant. However, when, on direct examination of the plaintiff

by his attorney, it was brought out that plaintiff had received a letter from Michele that "mentions an incident where you allegedly nearly killed her sister," plaintiff responded: "yes, I'm the sole cause of her sister's near death." Significantly, he acknowledged that the issue "never came up in any further visitations, that we had."

The children, however, did not allude to the incident at the hearing or indicate that it was the basis for their present resistance to visitation. Rather, Michele, described her feelings as to why she did not want to see her father in Germany, as follows:

Because I felt it was unfair for me to have to go thousands of miles away for three weeks with a man I haven't seen in seven years. It wasn't because I don't feel I should [have] a relationship with him, it was because of the way I was going to have to be forced into a relationship. And I felt that he was not thinking of how he thought we should have a relationship with him. I felt he was more forcing us to go over there for three weeks to be with him, who we haven't seen in seven years. I don't know him and I know he doesn't know us.

. . . . . . . .

I just feel that from the time that he was separated from you that when we were ordered to go on a visitation, he felt that by forcing us to go and by dragging us out of the house, crying and screaming, he felt that that was a way to force us to want to be with him, to force us to love him, to force us to care about him. And I don't believe that is true.

We have not been made aware of any attempt by the plaintiff to seek visitation after withdrawing his application in 1989. It was not until in November 1994, after defendant, apparently in good faith, moved for increased child support and payment of college tuition by plaintiff, that plaintiff cross-moved for enforcement of visitation and opposed the application of the defendant. This resulted in an order, dated November 16, 1994, that plaintiff was not obligated to pay college tuition for Michael, and also requiring that the three children visit plaintiff in Germany in August 1995.

A plenary hearing regarding child support was scheduled for July 5, 1995. On that date, plaintiff, a Lieutenant Colonel in the Army, consented to increase support to $1,500.00 per month, and defendant was to leave the courthouse in Freehold, gather the

children, two of whom were teenagers, and facilitate visitation between plaintiff and the children at plaintiff's sister's home in Middletown that afternoon. When that visit was not accomplished, plaintiff filed an Order To Show Cause, resulting in the plenary hearing of September 6, 1995 and the supplemental orders now on appeal. At the September 1995 hearing, plaintiff implored the judge to terminate child support because he felt he had no relationship with his children. He further acknowledged that whether the children were "to be a part of my life ... is a decision that they are going to have to make as they live through life."

Subsequent to rendering his written opinion of January 26, 1996, the judge entered an order, dated February 20, 1996, appointing a "guardian ad litem" to represent the three children; authorizing the guardian to meet with and interview the defendant and the three children as often as necessary; giving the guardian authority to communicate with the childrens' therapist; and holding defendant solely responsible for payment of the guardian and therapist fees. Further, she was directed to take all measures to ensure that the children communicate with the plaintiff at the rate of one letter and one phone call each week per child and that she compel the three children to address each point raised by the plaintiff in their correspondence of the following weeks. Defendant was ordered to give the guardian ad litem her monthly telephone bills to be considered as evidence corroborating the telephone calls were made by the children. Failure of the defendant to take all necessary steps regarding the letters and telephone calls was stated to be the subject of further proceedings upon application of the plaintiff or his representative.

In addition, a monetary sanction of $1,250.00 was imposed against the defendant payable to the Monmouth County Probation Department within thirty days, to be paid to the plaintiff. Defendant was also ordered to pay plaintiff's attorney the sum of $5,249.34 in equal installments over a period of one year as "counsel fees" related to the enforcement of visitation proceedings. Defendant's motion for reconsideration was denied by order dated

March 29, 1996, and an additional counsel fee of $300.00 was imposed for that supplemental motion.

The nature of the proceeding was not one for contempt under *R.* 1:10–2. Rather, the application was for enforcement of the court's order for visitation made under *R.* 1:10–3. Relief under *R.* 1:10–3, whether it be the imposition of incarceration or a sanction, is not for the purpose of punishment, but as a coercive measure to facilitate the enforcement of the court order. *See Department of Health v. Roselle,* 34 *N.J.* 331, 169 *A.*2d 153 (1961); *Pierce v. Pierce,* 122 *N.J.Super.* 359, 300 *A.*2d 568 (App.Div.1973).

We do not dispute the view that a monetary sanction imposed pursuant to *R.* 1:10–3 is a proper tool to compel compliance with a court order. *See Franklin Township v. Quakertown,* 274 *N.J.Super.* 47, 55–56, 643 *A.*2d 34 (App.Div.1994). We are convinced, however, from the tenor of the judge's ruling and order imposing the penalties and sanctions, which included the assessment of all counsel and therapy fees, that these sanctions constituted specific and overt punishment for what the judge concluded was defendant's improper conduct over the years in failing to facilitate the court's past visitation orders. The court's action in this regard was so overwhelmingly punitive as to be improper without the benefit of a proceeding under *R.* 1:10–2 and its safeguards. Therefore, even if there were a proper factual basis for the judge's conclusions of defendant's culpability, the procedure employed was insufficient to warrant the action which he took.

Regarding our conclusion that the imposition of fees against defendant was solely punitive, we note specifically that the judge did not purport to consider any of the factors set forth in *N.J.S.A.* 2A:34–23 and *R.* 4:42–9. The judge failed in any way to consider the respective financial circumstances of the parties, whether the award was reasonable and just or the extent to which the parties acted in good or bad faith in bringing the matter before the court. *See N.J.S.A.* 2A:34–23. Clearly, the assessment against defendant of 100% of plaintiff's counsel fees, the full cost of therapy and

guardian fees, and the expense of separate communication abroad to the father each week by each of the three children appears draconian when imposed upon a parent providing a college education for two children without contribution to that expense from the father. Viewed objectively it constitutes unusual and severe punishment; not a proper and just coercive means of enforcing the court's visitation order.

We add that, as it now appears that Michael is 20 years of age and Michele is 18, we expect on remand that the judge will consider the continued viability of its February 20, 1996 order directing the defendant to compel the children to communicate with the plaintiff. Obviously, it is appropriate that the defendant not in any way discourage communication; however, it would appear that the court has put the defendant in the position of a police authority with respect to these two adult children, which can only serve to impair the relationship the children have with their mother.

In addition, inasmuch as the defendant has already paid the monetary sanction, counsel fees, therapy fees and guardian's fees imposed, the court shall undertake a review of all of the necessary factors pertaining to such awards, and after making proper findings with regard to the imposition and apportionment of these obligations, shall order that plaintiff repay defendant to the extent required.

Reversed and remanded.