267 N.J. Super. 493 (1993)
631 A.2d 1274
JOHN PETERSON, PETITIONER-RESPONDENT,
v.
HERMANN FORWARDING CO., MID-FLORIDA MINING, PILOT TRUCKING, MC LEAN TRUCKING, P.I.E. NATIONWIDE, MCDONNELL DOUGLAS AND COMMISSIONER OF LABOR AS CUSTODIAN OF THE SECOND INJURY FUND, RESPONDENTS-RESPONDENTS, AND YELLOW FREIGHT SYSTEM, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 1993.
Decided October 13, 1993.
*494 Before Judges SHEBELL, LONG and LANDAU.
Joseph M. Soriano, argued the cause for appellant (Mattson, Madden & Polito, attorneys; Le Roy Mattson, of counsel; Joseph M. Soriano, on the brief and reply letter brief).
*495 Sheldon Schiffman, argued the cause for respondent, Mc Lean Trucking (Fred S. Brause, Jr., attorney; Sheldon Schiffman, on the letter brief).
Chester Tigges, argued the cause for respondent, Pilot Trucking (Thomas H. Green, attorney; John J. Jasieniecki, on the letter brief).
Lois J. Gregory, Senior Deputy Attorney General, argued the cause for Second Injury Fund (Fred DeVesa, Attorney General; Ms. Gregory, on the letter brief).
Mark P. Rockwell, argued the cause for respondent, Mid-Florida Mining (Lenahan & Rockwell, P.A., attorneys; Mark P. Rockwell, on the letter brief).
Ira Sukoneck, argued the cause for respondent, Hermann Forwarding (Braff, Harris & Sukoneck, attorneys; Ira Sukoneck, of counsel; Robert Re, on the brief and reply letter brief).
Allan L. Lockspeiser, argued the cause for petitioner (Wysoker, Glassner & Weingartner, attorneys; Allan L. Lockspeiser, on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
This is an appeal from an Order of Judgment entered by the Judge of Compensation finding petitioner one hundred percent totally and permanently disabled, with seventy-two and one-half percent of the total disability assessed against appellant, Yellow Freight System, Inc. ("Yellow Freight"), and twenty-seven and one-half percent of the total disability assessed against the Second Injury Fund.
On October 1, 1984, John Peterson ("petitioner") filed a claim petition in the Division of Workers' Compensation against Hermann Forwarding Company ("Hermann Forwarding"), alleging injuries as a result of an accident on October 1, 1982. On October *496 30, 1984, Hermann Forwarding filed an answer to this claim petition admitting the accident.
Over two years later, on November 6, 1986, petitioner filed a Notice of Motion to Join the Second Injury Fund. An Order to that effect was granted on February 18, 1987. Thereafter, petitioner filed claim petitions against several employers alleging aggravation of petitioner's injuries by occupational exposure subsequent to the October 1, 1982 accident. Claims were filed against Mid-Florida Mining ("Mid-Florida"), Yellow Freight, Pilot Trucking ("Pilot Trucking"), McLean Trucking Company ("McLean Trucking"), P.I.E. Nationwide, Inc. ("P.I.E."), and McDonnell Douglas Truck Services, Inc. ("McDonnell Douglas"). All of these respondents filed answers denying petitioner sustained any work-related disability.
The claims were consolidated for trial and the matter was tried over the course of five days. The judge rendered a written decision on May 18, 1992, wherein she found that petitioner was one hundred percent permanently and totally disabled. She assessed seventy-two and one-half percent of the total disability against respondent, Yellow Freight, and twenty-seven and one-half percent of the total disability against the Second Injury Fund. An Order for Judgment was entered on June 4, 1992. Respondent, Yellow Freight, filed this appeal.
We describe in detail the facts presented at trial. On October 1, 1982, petitioner was involved in an accident while employed as a tractor-trailer driver by Hermann Forwarding. He had completed a delivery and while getting back into the tractor, his foot slipped off the fuel tank. He held onto the grab rail with his right arm extended up, and felt severe pain through his shoulder and neck. When he released his grip on the grab rail he dropped to the ground, landing with his total weight on his right leg. He stated, "I took the shot of that up through my leg into my hip and I went to the ground as a result of it." Petitioner sought emergency medical treatment at the Saint Peters Medical Center, where he complained of pain in both shoulders, neck and down the *497 low back. He received follow-up care from a Dr. Zawadsky on one occasion, and a Dr. Troncoso on approximately seven occasions. Petitioner missed one month of work.
Petitioner attempted to return to work in November 1982, but found that Hermann Forwarding had ceased operations. Petitioner then went to his union to find work. He sought work out of economic necessity because he had a family to support. He did not get an assignment until March 1983, when he obtained a position with Mid-Florida Mining as a truck operator. Petitioner was at Mid-Florida until October 1983.
Petitioner's job activities at Mid-Florida included driving back and forth from New Jersey to Florida and local routes as well. At Mid-Florida, petitioner complained of "empty trailer bouncing" which would cause his right leg to get numb and require him to make stops on his route to walk around a bit. Petitioner was required to re-palletize twenty-five pound bags of kitty litter. This caused him to bend down in a squat position and his lower back would tighten up. He testified that at this job "you take a beating" and at the end of the day you do not feel like you want to do any more work. In describing the pain he felt while at Mid-Florida, petitioner testified:
The neck would stiffen up in through the shoulder area. The lower back would hurt. The hip, I would have to sit sideways sometimes too at the end of the day to come back. It was just outright pain. There is no other way to describe it. It's just something I had to live with.
Petitioner testified that he left Mid-Florida because he could no longer take the long hours of driving, and could not tolerate the bouncing up and down in the truck.
Petitioner also worked at McLean Trucking on the following occasions: eight hours in October 1983; eight hours in March 1984; eight hours in April 1984; forty hours in May 1984; and forty-eight hours in June 1984. He drove forty to forty-five thousand pound loads in a stripped-down tractor trailer with no power steering, and was required to palletize the freight. He testified that in doing this work, he suffered pain in his back, right *498 hip, and right leg. He would also get pain in his neck and it would stiffen up.
Petitioner worked for Pilot Trucking, as a truck and tractor operator. There, he worked for two days in November 1983, two days in December 1983, three days in January 1984, and nine days in February 1984. He said that the work had the same effect on him as the work at the other companies and described some of the "runs" as punishment.
During 1984, petitioner briefly worked for McDonnell Douglas, but he cannot recall for how many days. He testified that while there he delivered and palletized loads, and on occasion had to use a hand jack. This work also affected his condition.
Petitioner worked for Yellow Freight for one day in April 1984, for four days in May 1984, and on June 18, 1984. Petitioner testified that his work at Yellow Freight was the same as at the other companies, stating:
[A]s a shape up, you usually get loads to go out and deliver and pick up; so, in essence, it would be the same thing; lifting, moving freight, backing in, hooking up and dropping.
Petitioner never worked after June 18, 1984, thus Yellow Freight was his last employer. He asserted that he could no longer take the pain. However, after leaving Yellow Freight, petitioner collected unemployment benefits for six months. He also contacted the union seeking employment. On cross-examination, petitioner recognized that this was holding himself out as ready, willing and able to work, but replied that he had no money and no choice. He testified that he had no accidents after the October 1, 1982 accident with Hermann Forwarding.
Dr. Paul B. Shapiro, petitioner's orthopedic expert, first examined petitioner on October 16, 1984. He re-examined petitioner on June 4, 1986 and November 6, 1990. Dr. Shapiro testified that his October 16, 1984 examination showed the following with regard to petitioner's neck and shoulder area:
He had flattening of the cervical curve, which is certainly an objective finding; marked limitations of motion in, really, all directions. Flexion lacking 25 degrees *499 out of a normal range of 45 degrees, a decrease greater than 50 percent. Extension lacked 20 degrees, again, almost a 50 percent reduction. Bending to the right lacked 25 degrees, to the left 15, bending to the right, of course, again, was a greater than 50 percent reduction in range; to the left, a 30 percent reduction. Twisting both right and left were significantly decreased. As far as in regard to the result [sic] shoulder, the elevation was restricted by approximately 10 percent. His external rotation lacked a quarter, essentially a quarter of the range as internal rotation; again, another 25 percent of the normal range.
With regard to petitioner's low back, Dr. Shapiro testified:
[W]e have flattening of the normal curve, which is objective; increased firmness and hardness of musculature which is likewise an objective finding, and limitation of motion in all directions. To a significant degree the right hamstring spasm was significant, of course, and the absence of the Achilles reflex on the left. Straight leg raising limitations, the positive Lasegue's sign bilaterally, and the weak Patrick's test bilaterally is not terribly meaningful, but was present.
During this examination, Dr. Shapiro elicited petitioner's medical history and reviewed petitioner's hospital records. Based on this examination, he diagnosed "residuals of contusions and strains of the cervicodorsal, right shoulder and lumbar areas, with aggravation of underlying osteoarthritis." Dr. Shapiro estimated disability at forty percent permanent partial total.
On June 4, 1986, Dr. Shapiro took an interim medical history of petitioner and learned that petitioner had been under the care of a Dr. Friedman, who had referred petitioner for an MRI. In addition, petitioner sought treatment with a chiropractor. Dr. Shapiro increased his estimate to sixty-six and two-thirds percent permanent partial total disability.
Dr. Shapiro testified that although his examination only revealed a slight worsening, he now had the benefit of MRI studies, and, therefore, increased the disability percentage. The MRI showed the presence of two herniated discs and "annulus bulging at C4-5," which were not apparent at the 1984 examination. Dr. Shapiro's diagnosis was residuals of contusion and strains of the cervicodorsal, right shoulder, and lumbar areas with aggravation of underlying osteoarthritis and herniation of nucleus pulposa at L-4, 5 and L-5, and S-1 with right sciatic neuralgia.
Dr. Shapiro's examination of November 6, 1990 showed that petitioner continued to have discomfort in the neck and low back, *500 and pain radiating from the neck into the right shoulder and arm, and occasionally into the left arm. The doctor stated that there were some changes, significantly there was a loss of flexion, that was now an additional ten degrees from thirty-five to forty-five degrees. Dr. Shapiro increased his estimate to seventy percent partial total disability, orthopedically. He explained that the increase in percentage was due to the increased loss of flexion, and an awareness that he had been too conservative in his prior estimations.
Dr. Shapiro was presented with a hypothetical question, incorporating the past employment and medical history, and was asked to give his opinion as to causal relationship. He testified that a causal relationship for the findings he made on these three examinations existed for the 1982 accident and the continuing work effort that petitioner made until such time as he ceased work.
On cross-examination, Dr. Shapiro testified that he could not apportion petitioner's disability to each employer. He stated that he could not separate one day from the other, and that each day petitioner worked in the two-year period from 1982 to 1984, doing the same type of work, put him at risk of increasing disability. He testified that he could not say within a reasonable degree of medical probability whether petitioner's last day of work at respondent did or did not materially contribute to his overall disability. When asked about the manifestation date of petitioner's herniated discs, Dr. Shapiro testified that although they were not evident until a 1985 MRI, they could have been there from 1982, "[w]e just don't know."
Dr. Richard D. Rubin, a doctor specializing in neurology and psychiatry, also testified on petitioner's behalf. Dr. Rubin conducted a neuropsychiatric evaluation on August 21, 1986 and reviewed petitioner's past medical records. Dr. Rubin testified to the following diagnosis:
I noted he had multiple orthopedic disabilities which were actually demonstrated on the films. I found he had cervical lumbar radiculitis. He had post-knee surgery, *501 both knees, which was orthopedic. I concluded he had a mixed psychoneurosis with phobic active avoidance of exertion and depressive trend or depressive mood disorder.
Dr. Rubin estimated that petitioner had a neuropsychiatric disability of fifty percent permanent partial total, and neurological disabilities of seventeen and one half percent permanent partial total for cervical radiculitis, and seventeen and one-half percent permanent partial total for lumbar sciatic radiculitis.
On August 16, 1991, Dr. Rubin again examined petitioner. He found petitioner to be more depressed and increased the estimated neuropsychiatric disability to sixty percent permanent partial total. He said that petitioner cried a great deal, and would become depressed and apprehensive at the prospect of exertion because of his chronic pain.
In response to a hypothetical question, Dr. Rubin gave the opinion that:
[T]he further efforts that he made subsequent to the accident of 1982 caused and aggravated and accelerated those pre-existing conditions which themselves were caused or aggravated by the accident of 1982, got worse and worse in every regard until, I think, in an emotional reaction he gave up on himself in 1984 from just emotionally he couldn't take the exertion anymore.
Dr. Rubin further testified, however, that he did not feel that petitioner's last day at work at Yellow Freight materially contributed to his disability. He opined that there is nothing to point to any of petitioner's employment after the 1982 accident as material. The doctor stated that he specifically asked petitioner if there was any accident or injury, and the petitioner answered no. Dr. Rubin explained:
It was an accumulation of repeated episodes of pain that got to the point where he had an emotional drain, a break down and the way he made himself feel better was to walk away. (Emphasis added)
Dr. Rubin testified that in his opinion petitioner could not go back to this particular work, but he could be retrained for sedentary work. However, he opined that the petitioner could not compete in the ordinary labor market in New Jersey in his present condition. Dr. Rubin stated that even holding the steering *502 wheel caused petitioner pain in the shoulders which radiated into his arms and hands.
Dr. Steven Frank, a medical doctor certified in family practice, testified on behalf of Yellow Freight. He examined petitioner on October 2, 1990 and reviewed petitioner's medical records before giving the following opinion:
I feel that this man has multi level degenerative disc disease in the neck, with arthritic spurs or spondylosis, and he has multiple level degenerative disc disease in the low back .... clinically he has disc herniation L5-S1 at this point and my x-rays showed that there are multiple levels, actually all the lumbar areas even up into the lower thoracic spine ... the MRI scan shows the disk herniations at L4-5 although clinically I didn't see it and it probably clinically is of little significance.
Dr. Frank testified that petitioner's problems in the neck originated in 1961 and the problems in the low back originated in 1972. He estimated petitioner's disability at twenty percent permanent partial total in the neck, and twenty percent permanent partial total in the low back. When asked if, within a reasonable degree of medical probability, any disability was related to petitioner's last day of work at respondent, Dr. Frank stated, "[y]ou don't cause this in one day or aggravate it in one day unless there's a specific accident or incident." He opined that petitioner would be able to work as a truck driver, with certain restrictions, including no repetitive bending or lifting, but that he could not drive a tractor trailer.
Testimony regarding accidents petitioner was involved in prior to the 1982 accident reflects that on January 25, 1965, petitioner was injured while employed by Hermann Forwarding. For that injury, he received an award of five percent permanent partial disability, representing four percent for his neck disability and one percent for post concussion syndrome. He was also involved in compensable accidents involving his arms and neck on May 23, 1972, July 8, 1973, and February 5, 1974. These were consolidated and petitioner received an award of fifteen percent permanent partial disability. On January 3, 1975, petitioner injured his knee and received a workers' compensation award of fifteen percent permanent partial disability. Petitioner was involved in a non-work *503 related accident in 1977 where he injured his left knee and surgery was required. He lost two and one-half months work as a result of that accident.
Appellant contends that the Judge of Compensation incorrectly found that petitioner is totally disabled and improperly assessed liability against Yellow Freight. It argues that petitioner's disability is not "due in a material degree" to petitioner's last day of work at Yellow Freight.
The standard of review applicable is the following:
`[W]hether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering `the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility (citation omitted) and, in the case of agency review, with due regard also to the agency's expertise where such expertise is a pertinent factor.
[Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965) (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)).]
See De Angelo v. Alsan Masons, Inc., 122 N.J. Super. 88, 89-90, 299 A.2d 90 (App.Div. 1973), aff'd o.b., 62 N.J. 581, 303 A.2d 883 (1983); see also, State, Dept. of Health v. Tegnazian, 205 N.J. Super. 160, 172-74, 500 A.2d 398 (App.Div. 1985).
Petitioner alleged occupational exposure against the various respondents who employed him subsequent to the October 1, 1982 accident at Hermann Forwarding. No accidental injuries were alleged by petitioner after the 1982 accident. Compensable occupational disease is defined as:
a. For the purpose of this article, the phrase `compensable occupational disease' shall include all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment.
b. Deterioration of a tissue, organ or part of the body in which the function of such tissue, organ or part of the body is diminished due to the natural aging process thereof is not compensable.

[N.J.S.A. 34:15-31 (emphasis added).]
It is significant that a petitioner must prove that the disability is due in a material degree to causes characteristic of a particular trade or occupation. Ibid.
*504 N.J.S.A. 34:15-7.2, which relates to claims for compensation for injury or death from cardiovascular or cerebral vascular diseases, defines the term "material degree" as "an appreciable degree or a degree substantially greater than de minimis." We apply the same definition of "material degree" in N.J.S.A. 34:15-7.2 to N.J.S.A. 34:15-31. See Perez v. Pantasote, Inc., 95 N.J. 105, 116, 469 A.2d 22 (1984). Therefore, under N.J.S.A. 34:15-31, a petitioner must show that the alleged occupational exposure contributed to the resultant disability by an appreciable degree or a degree substantially greater than de minimis.
We conclude that the record does not support the finding of the Judge of Compensation, who found that conditions characteristic to the occupation of petitioner at the subsequent employers contributed in a material degree to petitioner's disability. We believe that the finding of the Judge of Compensation was a mistaken one when viewed in the context of the 1982 accident, petitioner's subsequent work history, and the natural progression of his injuries.
From March 1983 to June 18, 1984, petitioner worked for the five trucking companies named as respondents. After the October 1982 accident, his work was somewhat sporadic. He returned to work after the accident out of economic need, despite his prior disability. At the end of his work day he experienced pain in the shoulder area, the lower back and the hip. These were the areas last injured in his accident of October 1, 1982. Clearly, because of his pre-existing conditions, petitioner's work activities at the subsequent employment caused him to suffer greater pain than he would have experienced had he remained sedentary. However, an employer is not required to compensate an employee for pain. There must be proof of a work related injury or condition resulting in permanent disability. See N.J.S.A. 34:15-36. All of these subsequent jobs required physical activity, including lifting, loading and unloading of trucks. The work, however, did not appear to be any more strenuous than petitioner, or others in his occupation, would otherwise routinely encounter as a truck driver. Nor *505 should the work have caused injury resulting in permanent disability, despite the fact that petitioner suffered pain while engaged in such activities.
We acknowledge that Dr. Shapiro opined that each day petitioner worked in the two-year period from 1982 to 1984, doing the same type of work, put him at risk of increasing disability. He supported his theory by the following reasoning:
At various times in the next several years he worked at jobs that required him to do lifting, loading and unloading of trucks for various people at various times, all of which would add to and aggravate his prior problems with his  muscular changes in the neck and back. They would tend to aggravate pre-existent osteoarthritis and, at some point, lead to the herniation of the two lumbar discs.
However, Dr. Shapiro's diagnosis following his initial exam of October 16, 1984, revealed conditions of a traumatic nature which were obviously attributable to the October 1982 accident. He diagnosed, "residuals of contusions and strains of the cervicodorsal, right shoulder and lumbar areas, with aggravation of underlying osteoarthritis." Significantly, Dr. Shapiro's subsequent examinations revealed a progressive worsening of petitioner's disabling conditions, despite the fact that there was no further work effort.
Dr. Rubin's testimony that "an accumulation of repeated episodes of pain" caused an "emotional drain, a breakdown" which caused him to give up, appears to best explain petitioner's termination of work effort. However, we are persuaded that where the subsequent employment, without the intervention of additional trauma or physical insult, merely causes pain from pre-existent conditions to be manifested, that liability should not attach to the subsequent employer even where the result is that the employee then realizes that continued employment is not feasible. Cf. Saunderlin v. E.I. DuPont Co., 102 N.J. 402, 508 A.2d 1095 (1986). A contrary holding would surely discourage employers from hiring persons who had suffered prior injuries but needed to work even though it might be painful.
The Judge of Compensation found that Yellow Freight must be charged with the responsibility of compensation payments for total disability, subject only to a credit for the pre-existing disability *506 which she assessed against Second Injury Fund. The judge explained her ruling as follows:
The court is satisfied that petitioner's orthopedic disability is the result of the totality of all of the stresses and accidents the petitioner suffered during his career as a truck driver. The difficulty, however, is to determine which respondent or respondents, if any, are responsible for payment of this disability. All the doctors agree that it is not possible to fix disability following the admitted accident of October 1, 1982. All the doctors agree that it is not possible to say that the last day worked significantly added to petitioner's disability. That day of work was like all other days petitioner worked. He didn't suffer any accident or incident but he was jounced around while driving his truck and he did lift and bend. This leaves the court with the unenviable task of fixing responsibility, if she can, when the medical experts could not, or dismissing petitioner's claim for failure to sustain his burden of proof of that responsibility. [Emphasis added.]
In holding Yellow Freight solely liable, the judge relied on Bond v. Rose Ribbon & Carbon Mfg. Co., 42 N.J. 308, 311, 200 A.2d 322 (1964). In Bond, the petitioner was exposed to work conditions which activated or caused a progressive occupational disease, while working under successive employers. The Court found it impossible to reconstruct the rate of progression of the disease because the employee continued to be exposed to conditions which aggravated the disease in unascertainable stages. Ibid. Therefore, the Court developed the following test:
To avoid the morass into which litigation would be pitched were apportionment required, and to eliminate the recognized unsatisfactory nature of any such attempted ascertainment, we conceive that the most workable rule and that most consistent with the philosophy and public policy of the Workmen's Compensation Act is to hold liable that employer or carrier during whose employment or coverage the disease was disclosed as above noted, i.e., by medical examination, work incapacity, or manifest loss of physical function.

[Ibid. (emphasis added).]
The Court noted that while the test is arbitrary and "may on occasion cause some apparently unfair results, over the years it should result in an equitable balancing of liability." Ibid.
In this case, the judge would not have been correct in applying Bond to include the disability petitioner sustained while employed by Hermann Forwarding, even if the subsequent employment materially contributed to petitioner's disability. The accident of *507 October, 1982 was a definite and distinct accident sustained in the course of employment. It was not an occupational disease caused by exposure within the contemplation of Bond. The responsibility for the consequences of that accident cannot be heaped on a subsequent employer under an occupational disease theory merely because of difficulty in fixing the disability caused by the prior accident.
Further, under the Bond rule, the employer during whose employment the disease is disclosed becomes liable. Bond, supra, 42 N.J. at 311, 200 A.2d 322. Disclosure can be by medical examination, work incapacity, or manifest loss of function. Ibid. Here, the condition was disclosed long before petitioner was employed at respondent, Yellow Freight. The petitioner suffered his last disabling accident at Hermann Forwarding and manifested his disability continuously thereafter. The work he carried out after the October 1982 accident was in spite of his disability. Even when asked about the manifestation date of petitioner's herniated discs, Dr. Shapiro testified that although they were not evident until a 1985 MRI, they could have been there from 1982, "[w]e just don't know." In addition, Dr. Rubin admitted that there was nothing to point to any particular employer after the 1982 accident as material. He specifically asked petitioner if there was any accident or injury, and the petitioner answered no. Dr. Frank stated, "[y]ou don't cause this in one day or aggravate it in one day unless there's a specific accident or incident."
An analysis of our holding in Kozinsky v. Edison Products Co., 222 N.J. Super. 530, 537 A.2d 737 (App.Div. 1988), is helpful here. In January 1983, Ms. Kozinsky fell in a meat locker and injured herself while employed at a supermarket. Id. at 532, 537 A.2d 737. In June 1983, she stopped working at the supermarket, and in September 1983 she began a six-week employment with a new employer. Id. at 532-533, 537 A.2d 737. From December 1983, until February 1984 petitioner worked at a third job. Id. at 533, 537 A.2d 737. The second employer argued that there was insufficient medical evidence to show occupational aggravation of *508 an injury suffered by petitioner while working at the supermarket, and the last employer argued that petitioner suffered only "innocent aggravations" while employed with it. Id. at 532. We held that the subsequent employers were not liable because there was not sufficient objective medical evidence of a significant increase in the petitioner's disability resulting from the subsequent employments. Id. at 539, 537 A.2d 737.
The medical experts in Kozinsky were not able to allocate the percentages of increased disability arising from the two subsequent employments. Id. at 535, 537 A.2d 737. The medical experts in this case are similarly not able to allocate percentages of increased disability to the subsequent employments. In Kozinsky we stated:
We do not see this as a case where a substantial contribution to disability from the subsequent accidents or employments was plainly established, but where it is difficult to apportion the extent of those contributions. (Citation omitted). Rather, our careful canvass of the entire record discloses that there is no credible evidence of material contribution by the two subsequent employments.

[Id. at 537, 537 A.2d 737 (emphasis added).]
We do not believe Kozinsky differs from this case. In this case there was no credible evidence of a legally recognizable material contribution by the subsequent employments. The record of the activity petitioner performed after the October, 1982 accident demonstrates an absence of proof of any unusual events. Rather, as in Kozinsky, petitioner's inability to tolerate the efforts required at those employments demonstrates the degree to which the initial injury rendered petitioner disabled. Id., at 539, 537 A.2d 737. The petitioner here worked only with much difficulty after the injury. While the work efforts of petitioner in this case may be considered strenuous by some, they were was not unusual for petitioner's line of work. It was what he would have been able to do but for the October, 1982 accident. Here, as we found in Kozinsky, there is no basis in the evidence to support a determination that there was a significant increase in disability attributable to the employments which followed petitioner's compensable *509 accident. Id. at 538, 537 A.2d 737. Certainly, petitioner's disability increased, however, that was due to the progression of the disease, as it continued to do so after all employment had ceased.
Recently, in Baijnath v. Eagle Plywood, 261 N.J. Super. 309, 618 A.2d 902 (App.Div. 1993), we considered a case that involved two successive compensable traumatic injuries. We held that where two successive injuries combine to produce permanent injury, there should be apportionment among the employers to the degree that each contributed to the total result. Id. at 314-315, 618 A.2d 902. We distinguished traumatic injury cases from occupational injury cases and the Bond rule, stating, "[t]he rule as to occupational injuries is significantly different." Id. at 315, 618 A.2d 902. We explained:
Occupational injuries have an insidious etiology. They can exist for a protracted period without objective manifestation. An effort to apportion the result among the relevant historical employers and/or insurance carriers would be totally speculative.

[Ibid.]
We then stated:
Traumatic injuries are quite different. Their incidence is fixed and determinable. The allocation of responsibility may be difficult; the proofs may not permit of certainty. However, there are distinct harms and some reasonable basis in the facts for allocation, (citation omitted), and mere lack of certainty is not a bar to a damage award. (Citations omitted).

[Id. at 315-316, 618 A.2d 902.]
In this case, it cannot be said that events at petitioner's subsequent employments legally and materially contributed to petitioner's disability. Therefore, Hermann Forwarding, as petitioner's employer when he sustained his final compensable accident, must be held responsible not only for the immediate injury and disability, but also for the progressive worsening of his condition resulting in total disability.
We agree that the judge based her findings of total and permanent disability on sufficient credible evidence. We further are satisfied that the judge correctly assessed twenty-seven and *510 one-half percent of the total disability against the Second Injury Fund. Under N.J.S.A. 34:15-95, a petitioner is eligible to receive payments under the Fund if totally disabled as a result of a combination of a compensable disability and pre-existing disabilities. The record clearly documented petitioner's pre-existing disabilities and eventual total and permanent disability.
We affirm that portion of the Order of Judgment entered by the Judge of Compensation finding petitioner one hundred percent totally and permanently disabled, with twenty-seven and one-half percent of the total disability against the Second Injury Fund. We reverse that portion of the judgment imposed against Yellow Freight.
The judgment is affirmed in part and reversed in part. The matter is remanded to the Division of Workers' Compensation for amendment of the Order of Judgment to reflect that the award of seventy-two and one half percent of total disability shall be payable by Hermann Forwarding and not Yellow Freight.