648 A.2d 748

ENRIQUE VIERA, PETITIONER–RESPONDENT, v. THE
LEVEL LINE, INC., RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 19, 1993—Decided November 1, 1994.

Before Judges DREIER, VILLANUEVA and WEFING.

*Christine M. Kerr* argued the cause for appellant (*Ms. Kerr*, attorney; *H. Adam Haas,* on the brief).

*Richard F. Teklits* argued the cause for respondent (*Hill Wallack,* attorney; *Alex J. Pearlberg,* on the brief).

The opinion of the court was delivered by

VILLANUEVA, J.A.D.

The Level Line, Inc. appeals from a workers' compensation judgment granting partial total permanent disability to petitioner, Enrique Viera. We remand for reconsideration and for the Judge of Compensation to make specific findings.

Petitioner filed a workers' compensation petition alleging orthopedic and pulmonary injuries and hearing loss related to his employment with Level Line. Petitioner was employed by The Level Line, Inc. (Level Line) for twenty-eight years until it closed in 1990, when he was 57 years old. He then collected unemploy-

ment benefits for three years until he found a job at a recycling company. He worked at his new job for one and one-half months until he was laid off because he was having trouble lifting things.

Petitioner worked as a helper and later a journeyman. He would lift, bend and carry various window products manufactured and assembled by Level Line, and he also worked in the mill, priming and glazing departments. He would assemble, sand and paint wooden windows. Petitioner testified that the environment in which he worked was very dusty. Black dust would accumulate in his nose and in the paper mask he was given. He also experienced nosebleeds.

Petitioner stated that he was also exposed to fumes from the treatment of the windows. He testified that the paper mask did not alleviate the fumes, and there was no ventilation equipment and no window in the room where they assembled the windows. He claimed that the wood, which was treated with a substance called "Woodlife," gave off fumes smelling like rotten eggs and would cause a rash on his hands and itchiness if gloves were not used.

Petitioner received a workers' compensation award in 1976, for 2½% of partial total permanent disability for the residuals of a left temporal puncture scar due to a 1975 accident involving a staple gun. In 1980, he received an award of 20% partial total permanent disability of the right leg for residuals of a meniscectomy for a 1979 accident in which he fell off a box. In 1987, he received an award of 15% partial total permanent disability for residuals of a lumbosacral sprain and bulging discs at L4–L5 and L5–S1 with right-sided radiculopathy resulting from a 1985 accident in which he injured his lower back while moving a heavy window.

Petitioner testified that the back pain he now experiences has been the same since his award in 1987. He has difficulty lifting and bending. He also cannot run and experiences trouble sleeping at night. Petitioner claimed that his right leg has worsened since the 1980 award.

He also testified to having shortness of breath when sleeping, climbing stairs or lifting. Petitioner further stated that when he cleans the yard of leaves or takes out the garbage he becomes fatigued and has difficulty breathing.

In 1988, petitioner was involved in a non work-related bus accident in which he injured his right arm and neck for which he received treatment. Petitioner also admitted to smoking a pack of cigarettes every two to four days since the age of 25 until he quit in 1989.

Dr. Silberner testified that when he examined petitioner on June 13, 1991, he asserted the following complaints:

First, progressive shoulder pain on the exertion so he had difficulty in breathing. On performing ordinary tasks of the ordinary living, such as walking two blocks, climbing one flight of stairs, or keeping up with peers. And he had a cough with sputum. His occupational history involved employment by Level Line Company from 1962 until September of 1990. He stated that in the course of that employment he had been exposed to chronic inhalation of irritating dust particles, chemical fumes, and other noxious elements which made him cough and feel short of breath. He did wear a protective mask when the dust was heavy. He stopped smoking during 1989. He does have diabetes which is being treated by diet alone.

Silberner also testified that petitioner had "some obstruction in the bronchial tubes" and large amounts of sputum. He agreed that petitioner's smoking was a factor in his bronchial problems but he could not apportion the problem between the smoking and exposure at Level Line. He concluded that the pulmonary disability was causally related to petitioner's exposure to black dust and fumes while at Level Line.

Dr. David Jay Scott, who examined petitioner on behalf of Level Line on August 11, 1992, stated that petitioner had no specific chief complaint but claimed he had pain in his back, right knee, neck and chest. He reported that the examination revealed "a well-developed, well-nourished male in no acute distress." He stated that petitioner had diabetes mellitus dating back to 1977 and hypertension manifesting more recently, but that "[n]either of these involvements and consequences of his diseases are in any way related by virtue of aggravation, exacerbation, causation or precipitation of his employment activities." He also stated that

petitioner's knee and back injuries were related to or exacerbated by his 1988 auto accident. He did not believe that the shortness of breath or chest pain were caused by work, and opined that these symptoms were related to angina caused by an arteriosclerotic heart disease.

On May 20, 1993, the Judge of Compensation denied Level Line's motion to compel petitioner to undergo a stress test.

On October 29, 1993, the Judge rendered a decision finding that petitioner was entitled to awards of 25% of partial total permanent disability for residuals of lumbar and lumbosacral sprain, bilateral sacroiliac sprain, right sciatic reference and aggravation of a bulging disc pathology at L4–5 and L5–S1; 30% of partial total permanent disability for residuals of internal derangement of the right knee, right knee arthrotomy and residual surgical scarification. Therefore, the orthopedic portion of his exposure yielded an award of 244.5 weeks payable at the rate of $222 per week totalling $54,279. A statutory credit for the prior awards was rendered in the amount of $17,102, leaving a net award of $37,177. The Judge also awarded 15% of partial total permanent disability for residuals of significant chronic bronchitis entitling petitioner to ninety weeks payable at the rate of $99 per week totalling $8,910. Thus, the total award was $46,087.

The Judge stated his award was not based on the medical experts' testimony, but rather was "based on my observations of petitioner together with my evaluation of the medical records and proofs before me." The Judge concluded that

[r]eviewing the petitioner's credible trial testimony regarding the pulmonary aspect of petitioner's occupational exposure, it is the finding of this Court that petitioner was exposed to mixed dust, fumes and odors. Petitioner identified one source of fumes as a chemical preservative called "Woodlife." The petitioner has credibly testified that he experiences difficulty breathing especially upon exertion. The petitioner has been a cigarette smoker but discontinued smoking in 1989. The occupational exposure in respondent's factory was a lengthy one consisting of 28 years.

During the trial I carefully considered the medical testimony of the respective internists. I was most impressed with the testimony of Dr. Silberner and considered his testimony to be medically persuasive and I rely upon it. Dr.

Silberner's evaluation of disability was an overall one and he could not apportion between smoking and petitioner's chronic bronchitis.

I have carefully considered Dr. Scott's testimony in this trial. I do not consider such testimony to be medically persuasive and I reject it.

It is the finding of this Court that petitioner has satisfied the criteria of the "Act," ... in regard to an award of permanent impairment on both an orthopedic and pulmonary basis.

Level Line appeals from that judgment.

## I.

Level Line disputes the Judge of Compensation's finding that the standard in *Perez v. Pantasote, Inc.*, 95 *N.J.* 105, 116, 469 *A.*2d 22 (1984) was satisfied by demonstrable objective medical evidence of restriction of function in the lower back and right knee. Instead, Level Line argues that the "correct inquiry was whether the alleged occupational exposure 'contributed to the resultant disability by an appreciable degree or a degree substantially greater than de minimis,' " quoting (*Peterson v. Hermann Forwarding Co.*, 267 *N.J.Super.* 493, 504, 631 *A.*2d 1274 (App.Div. 1993), *certif. denied*, 135 *N.J.* 304, 639 *A.*2d 303 (1994) and citing *Perez v. Pantasote*, 95 *N.J.* 105, 116, 469 *A.*2d 22 (1984)).

Level Line asserts that although petitioner's experts supported the figures awarded by the Judge of Compensation, the experts lacked a factual and scientific basis for their opinions, and the judge gave no explanation of why he relied upon their opinions and rejected the opinion of Level Line's physician. That is true. Furthermore, Level Line's physician examined petitioner at the time of his 1987 award and again in 1992 to evaluate petitioner's orthopedic injuries. Level Line's internist expert was denied a stress test which he contended would show that petitioner's shortness of breath and alleged bronchitis was actually symptomatic of a heart condition unrelated to petitioner's work.

In *Perez v. Pantasote, Inc.*, 95 *N.J.* 105, 109, 469 *A.*2d 22 (1984) the petitioner was injured in 1980 and his work became more difficult after that. That Court set forth that "[t]he first essential that must be met is a satisfactory showing of demonstrable

objective medical evidence of a functional restriction of the body, its members or organs. This determination can no longer rest upon petitioner's subjective complaints." *Id.* at 116, 469 *A.*2d 22. "Once a permanent disability is proven by such objective evidence, the next issue is determining whether the injury is minor or is serious enough to merit compensation. Material lessening of an employee's working ability is a significant, although not necessarily controlling, criterion in making this determination." *Ibid.* "Thus, the question to be answered is whether there has been an appreciable impairment of the employee's ability to work. If there has been, then the lessening criterion has been satisfied and the claim is compensable." *Id.* at 117, 469 *A.*2d 22. A second factor to consider is whether a disability exists that has impaired the individual's ability to engage in the " 'ordinary pursuits of life.' " *Ibid.* (quoting *Heidel v. Wallace & Tiernan,* 37 *N.J.Super.* 522, 528–29, 117 *A.*2d 678 (Cty.Ct.1955), aff'd o.b., 21 *N.J.* 335, 122 *A.*2d 180 (1956); Napier, "Impact of the Reform Act of 1980," 96 *New Jersey Lawyer* 17, 18 (1981)).

■ Level Line claims that petitioner not only failed to show causal relationship of any pulmonary disability to his employment at Level Line but also that any permanent disability existed at all. Petitioner bears the burden of proving by objective medical evidence the "functional restriction of the body, its members or organs." *Perez, supra,* 95 *N.J.* at 116, 469 *A.*2d 22; *N.J.S.A.* 34:15–36.

*N.J.S.A.* 34:15–36 defines partial permanent disability in which it states:

'Disability permanent in quality and partial in character' means a permanent impairment caused by a compensable accident or compensable occupational disease, based upon demonstrable objective medical evidence, which restricts the function of the body or of its members or organs; included in the criteria which shall be considered shall be whether there has been a lessening to a material degree of an employee's working ability....

Level Line cites the definition of chronic industrial bronchitis given by Dr. Silberner and Dr. Scott—a chronic cough producing sputum existing for at least three months in two consecutive

years. Dr. Silberner stated that petitioner's smoking was a contributing factor to his bronchitis, but Dr. Silberner's estimation of 40% partial total disability did not apportion the bronchitis between industrial and smoking causes and rather estimated disability for the bronchitis in general. Additionally, Level Line correctly argues that petitioner never testified to having a cough producing sputum but admitted that his testimony revealed all his complaints.

In any event, there was no scientific basis given for the bronchitis based upon the inhalation of wood dust or "Woodlife" fumes.

The two experts differed in their diagnosis; Dr. Silberner found bronchitis and Dr. Scott found hypertension. Dr. Silberner justified the differences in the spirometric tests given by Dr. Silberner and Dr. Scott as the result of petitioner not performing as well as one or not understanding. The Judge chose to rely on Dr. Silberner's findings, but never stated why.

In support of its argument that petitioner failed to prove his pulmonary problems were caused by his employment at Level Line, Level Line cites petitioner's admission that he smoked cigarettes from the age of 25 until 1989 at the rate of about a pack every two to four days. When he testified in 1992, he was 59, so he smoked for approximately thirty years. Level Line further asserts that the court improperly relied on the testimony of petitioner's expert, Dr. Silberner, because that expert could not support his finding that petitioner's exposure to wood dust caused chronic bronchitis and petitioner's stated symptoms did not match those described by either Dr. Silberner or Dr. Scott.

Dr. Silberner testified that his diagnosis of industrial bronchitis was based upon how petitioner's lungs sounded, fibrotic markings in his lungs shown on an x-ray and a decreased forced vital capacity demonstrated by spirometric testing. He also testified that petitioner's exposure to dust, chemical fumes and other noxious elements caused him to cough and feel short of breath and thus his disability was related to his employment.

■ *N.J.S.A.* 34:15–31 defines a compensable occupational disease and requires that the employment have contributed in a material degree to the disease:

a. For the purpose of this article, the phrase 'compensable occupational disease' shall include all diseases arising out of and in the course of employment, *which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment.*
b. Deterioration of a tissue, organ or part of the body in which the function of such tissue, organ or part of the body is diminished due to the natural aging process thereof is not compensable.

[Emphasis added].

Petitioner must prove that the alleged "occupational exposure contributed to the resultant disability by an appreciable degree or a degree substantially greater than de minimis." *Peterson, supra,* 267 *N.J.Super.* at 504, 631 *A.*2d 1274.

■ The expert opinion relied upon by the Judge was really a net opinion without consideration of what was caused by non-work related factors. Petitioner herein has had only one employer. Therefore Level Line is responsible for whatever is the total of his work related disabilities. There is no need to apportion the disability between the conditions observed at the time of the initial award, which may now have been aggravated or naturally progressed beyond their former state, and the conditions which may have been caused by the employment between 1987 and 1992. Whatever the end result may be, Level Line would be responsible, with a credit for what it has already paid. This basically is what the Judge of Compensation attempted to accomplish.

## II.

■ Level Line claims that the motion to compel petitioner to undergo a stress test should have been granted because Level Line's expert testified that petitioner suffered from hypertension and possible angina pectoris rather than bronchitis. Petitioner opposed the motion, arguing it was without basis under the Workers' Compensation Act and that, because a heart condition was not being claimed, there was no need for the test. The Judge

denied the motion because it deemed the test an invasive procedure and would not force petitioner to submit to it.

The Worker's Compensation Statute contains no requisite that physical examinations, to which a petitioner must submit under *N.J.S.A.* 34:15–19, be non-invasive. Nor does it set parameters as to how invasive the examination may be. However, we need not determine whether a petitioner must submit to an invasive procedure because thee is no evidence before us that any stress test is an invasive procedure.

■ . As petitioner points out, Level Line never made the request for a stress test until the middle of trial after three of five witnesses had already testified, even though Level Line had notice that such a test might be useful as disclosed in its own expert's report dated August 12, 1992.

Level Line cites *N.J.S.A.* 34:15–19 as support for requiring petitioner to undergo the test. That statute requires a petitioner to submit himself to physical examination and X-ray. Given the belated timing of Level Line's request, the Judge did not abuse its discretion when it denied the motion. There apparently are several types of stress tests. If such a test is not a threat to a petitioner's health or life, based upon medical evidence, there is no reason why a petitioner should not be subject to such a test when the facts warranted it, such as in this case.

### III.

■ Level Line contends that the Judge's reliance upon *Oswin v. Shaw,* 129 *N.J.* 290, 609 *A.2d* 415 (1992) was improper for determining whether permanent disability existed because *Oswin* is not a workers' compensation case.

■ The Judge merely referenced *Oswin* because of the similar language involved: *objective medical evidence.* The judge still applied the standards of workers' compensation cases: *i.e.,* demonstrable objective medical evidence of a restriction of function. *N.J.S.A.* 34:15–36 and *Perez* require as a threshold a showing of

demonstrable objective medical evidence of a functional restriction of the body, its members or organs, and that such a determination can no longer rest on petitioner's subjective complaints. *Perez, supra*, 95 *N.J.* at 116, 469 *A.2d* 22. That finding is contrary to *Oswin, supra*, 129 *N.J.* at 319, 609 *A.2d* 415, which involved New Jersey's no-fault automobile insurance statute, *N.J.S.A.* 39:6A–8(a), where the Supreme Court held that a plaintiff must satisfy a threshold by "objective, credible evidence." There is no reason why there should be different standards in requiring demonstrable objective medical evidence of a functional restriction of the body, its members or organs in workers' compensation proceedings than in the Superior Court for automobile accidents. *Cf. Rakip* v. *Madison Ave. Food Town*, 272 *N.J.Super.* 590, 596, 640 *A.2d* 1152 (App.Div.1994). *See also Thorpe v. Cohen*, 258 *N.J.Super.* 523, 530, 610 *A.2d* 878 (App.Div.1992) (involving the threshold requirement of the Tort Claims Act, *N.J.S.A.* 59:9–2(d)).

We remand to the Division of Workers' Compensation for additional evidence, if necessary, and reconsideration in accordance with *Perez* and for it to make specific findings. In addition, the Judge should entertain Level Line's motion to have petitioner submit to a stress test.