**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2859-16T1

DIANE LEBEDNIKAS,

    Petitioner-Appellant,

v.

ZALLIE SUPERMARKETS, INC.,
t/a SHOP RITE — LAUREL HILL,

    Respondent-Respondent.

_____

        Submitted July 9, 2018 — Decided July 24, 2018

        Before Judges Yannotti and Haas.

        On appeal from the New Jersey Department of
        Labor and Workforce Development, Division of
        Workers' Compensation, Claim Petition No.
        2014-28059.

        Lacovara & Burns, LLC, attorneys for appellant
        (Nicholas T. Lacovara, on the brief).

        Ann DeBellis, attorney for respondent (Ann
        DeBellis, of counsel; David P. Kendall, on the
        brief).

PER CURIAM

Petitioner Diane Lebednikas appeals from an order entered by the Division of Workers' Compensation (Division) dated January 27, 2017, which denied her motion for medical benefits. We affirm.

I.

In 2002, petitioner had a unicompartmental arthroplasty, or partial replacement of the right knee, and in 2012, petitioner had a total arthroplasty, or replacement of the left knee. On January 21, 2014, while employed by respondent in its deli department, petitioner caught her foot on a floor tile and twisted her right knee. The store's surveillance camera recorded the incident. Thereafter, petitioner had authorized treatment by Dr. Robert Falconiero, D.O.

In a report dated April 14, 2014, Dr. Falconiero provided a diagnosis for petitioner, noting a contusion, possible loosening of the partial replacement, degenerative arthritis, and vascular calcifications of the right knee. Dr. Falconiero recommended that petitioner return to the orthopedic surgeon who performed the partial replacement, Dr. Steven H. Kahn.

Dr. Kahn issued a report dated October 17, 2014, in which he stated x-rays indicated that petitioner's partial right knee replacement was in a satisfactory position and there was no fracture in the prosthesis. The x-rays also showed some degenerative changes in the patellofemoral joint and the lateral

compartment. Dr. Kahn recommended a bone scan to ensure there was no loosening of the prosthesis. He also recommended an MRI to determine whether petitioner sustained any ligament injury as a result of the January 21, 2014 incident.

Dr. Kahn issued another report dated November 17, 2014. The doctor noted that the recommended bone scan and MRI had been performed. The bone scan showed an "increase[d] uptake," which indicated a loosening of the partial right knee replacement. The MRI showed some degenerative changes in the patellofemoral joint medial compartment.

Dr. Kahn stated that petitioner's symptomatology had persisted despite the passage of time, physical therapy, anti-inflammatories, and use of a hinged knee brace. The doctor recommended surgery to convert petitioner's loose right partial knee replacement to a total replacement. He stated that within a reasonable degree of medical probability, the conversion was needed as a result of the January 21, 2014 incident.

Petitioner filed a motion with the Division seeking the medical treatment that Dr. Kahn recommended. Respondent opposed the motion. The judge of compensation thereafter conducted an evidentiary hearing in the matter. The parties stipulated to the admission of the surveillance video of the incident. Petitioner testified that the video accurately depicted the incident.

Petitioner further testified that on January 21, 2014, while working in respondent's deli department, she tripped, twisted her body, hit a table, and "felt something pop" in her right knee. Petitioner said that since that time, she has had pain and "[p]opping" in her right knee, which has gotten worse. Petitioner stated that immediately prior to the incident, she was not being treated for her right knee.

In support of her motion, petitioner presented testimony from Dr. Ralph G. Cataldo, D.O., who was qualified as an expert in osteopathic medicine, with a subspecialty in workers' compensation evaluations and pain management. Dr. Cataldo acknowledged that he is not board certified in orthopedics, and does not perform orthopedic surgery, such as knee replacements.

Dr. Cataldo testified that he reviewed petitioner's treatment records, the reports of the imaging studies of petitioner's right knee, the post-accident bone scan, and the surveillance video of the incident. He also examined petitioner.

Dr. Cataldo stated that the bone scan showed "an increased uptake" in the region of the partial knee replacement, which was consistent with the loosening of her partial knee replacement. He noted that the MRI of petitioner's right knee showed arthritis.

Dr. Cataldo testified, however, that petitioner's arthritis was not related to whether petitioner required a full right knee

replacement because petitioner had been "doing fine" until she suffered the "twisting injury" on January 21, 2014. He testified that petitioner needed the full knee replacement due to the January 21, 2014 incident.

On cross-examination, Dr. Cataldo stated that he did not know the type of device that was installed for petitioner's partial knee replacement or how long such replacements last. Dr. Cataldo noted that when he examined petitioner in August 2015, she was sixty years old and would be considered obese. He acknowledged that an individual's knee replacement could be affected by the individual's obesity, the level of activity, and the pressure placed on the knee.

Dr. Richard DiVerniero testified for respondent. He is board certified in orthopedic surgery. He has performed hundreds of knee replacements, including fifty revisions of partial knee replacements. After the January 21, 2014 incident, he treated petitioner. He saw her on May 30, 2014, June 20, 2014, December 19, 2014, and April 7, 2015.

Dr. DiVerniero noted that during his initial examination, he found that petitioner had a palpable knee joint effusion or swelling, but no warmth or redness. Petitioner had full extension and could raise her leg without lag. Her terminal flexion was

about one hundred degrees. She also had patellofemoral and medial joint line tenderness.

Dr. DiVerniero testified that petitioner had a "varus posture." He explained that neutral posture is "straight," but "varus posture" is "bowlegged" and "valgus posture" is "knock-kneed." He stated that in joint replacements, doctors try to achieve a "slight" valgus posture.

Dr. DiVerniero said petitioner's varus posture indicated she had "an issue" with her knee, but he found no appreciable laxity or instability. Dr. DiVerniero diagnosed pain in petitioner's joint and lower right leg, with localized osteoarthritis, which is "the wearing of the cartilage surfaces within a joint."

Dr. DiVerniero testified that he had reviewed the x-rays and CT scan of petitioner's right knee, which were consistent with wear in her partial knee replacement. He noted that the inside portion of the replacement is made of polyethylene, which is a "super type of plastic." Petitioner "had significant polyethylene wear" that resulted in the varus deformity.

Dr. DiVerniero stated that an x-ray from 2003 indicated that petitioner required the partial knee replacement because at that time only one compartment of her knee had shown wear. He testified that by the time he examined petitioner in May 2014, she had developed arthritis in the other two compartments of the right

knee. This was one of the reasons petitioner needed a conversion of the partial replacement to a total replacement.

Dr. DiVerniero saw petitioner again in December 2014. He noted an overall improvement in the condition of her knee. He said that after the January 21, 2014 incident, petitioner had pain but it was not agonizing pain. She continued to work and took anti-inflammatory medications. The effusion had resolved, and she was "back to her baseline."

Dr. DiVerniero further testified that the MRI did not show any evidence of a fracture or loosening of the prosthesis, but showed effusion and degenerative changes in the knee. He explained that the polyethylene in the prosthesis was producing particles, which were like dust, and they were accumulating in the knee. This was a "very inflammatory process" that "incites the body to attack [the particles] as foreign material" and causes the effusion.

Dr. DiVerniero opined that the January 21, 2014 incident did not damage petitioner's partial knee replacement or cause the need for additional treatment. He stated that petitioner required the conversion to a full knee replacement before the incident. He said the wear in the replacement was not due to a twisting injury.

The doctor also stated that the wear occurred over twelve years of normal functioning of the replacement, which generated wear-debris particles that caused inflammation and effusion. He

explained that the twisting injury that occurred on January 21, 2014, could have aggravated petitioner's soft tissues, but it did not "change the integrity of her components."

On January 25, 2017, the compensation judge filed a written opinion on petitioner's motion. The judge found Dr. DiVerniero's expertise in the field of orthopedic surgery was superior to that of Dr. Cataldo. The judge noted that Dr. DiVerniero was an accomplished orthopedic surgeon, who had specialized knowledge in knee pathology and its causes, and the types of surgery to address those conditions. Dr. DiVerniero also had personal involvement in petitioner's post-accident care.

The judge found that Dr. DiVerniero's opinion on causation was "more specialized, more credible and more persuasive than the proofs offered by the petitioner." The judge determined that petitioner had not carried her burden of proving that the need for the total knee replacement surgery was causally related to her January 21, 2014 incident. The judge filed an order dated January 25, 2017, denying petitioner's motion. This appeal followed.

## II.

On appeal, petitioner argues that the compensation judge erred by relying upon Dr. DiVerniero's testimony. He contends Dr. DiVerniero's testimony was not competent and should have been stricken.

"[T]he scope of appellate review of factual findings by a judge of compensation is limited." Renner v. AT&T, 218 N.J. 435, 448 (2014) (citing Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). We must determine "'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." Close, 44 N.J. at 599 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). Moreover, we must defer to the expertise of the compensation judges in addressing issues of disability. Perez v. Capitol Ornamental, Concrete Specialities Inc., 288 N.J. Super. 359, 367 (App. Div. 1996) (citing Lewicki v. N.J. Art Foundry, 88 N.J. 75, 88-90 (1981)).

As stated previously, at the hearing on petitioner's motion, Dr. DiVerniero testified that petitioner needed surgery to convert her partial knee replacement to a total knee replacement, but the conversion was not required due to the incident on January 21, 2014. The doctor testified that the conversion was required because of wear in petitioner's polyethylene partial knee replacement and the related progressive arthritis in the knee.

As noted, Dr. Cataldo offered a contrary opinion, but the judge found Dr. DiVerniero's opinion on causation was more credible and persuasive. The judge stated:

> Dr. DiVerniero's education, training and experience along with his very clear and detailed testimony clearly reveals that he is an accomplished orthopedic surgeon who has specialized knowledge with regard to knee pathology, the causes for such pathology and the types of surgery to address it. Dr. DiVerniero's explanation of petitioner's treatment, his use of the anatomic model to describe the knee condition and his explanation of the age-related breakdown of the prior, partial knee replacement hardware was credible and easy to understand.

The judge noted that Dr. DiVerniero had been personally involved in petitioner's post-accident care, and the doctor had reviewed the imaging studies and bone scan. The judge found that Dr. DiVerniero's expertise in orthopedic surgery was superior to that of Dr. Cataldo. He noted that Dr. Cataldo seemed to concede that point when he indicated that "a treating orthopedic surgeon would generally be in a better position to comment on a patient's condition than a doctor performing a one-time evaluation."

We are convinced there is sufficient credible evidence in the record to support the judge's assessment of the experts' credentials and testimony. In this regard, we note that "in a workers' compensation case, a treating physician is often in a better position to express opinions as to cause and effect than an expert who merely is examining the patient in order to give expert testimony." Bird v. Somerset Hills Country Club, 309 N.J.

Super. 517, 522-23 (App. Div. 1998) (citing <u>Bober v. Indep. Plating Corp.</u>, 28 N.J. 160, 167 (1958)).

Furthermore, Dr. DiVerniero's testimony provided ample support for the judge's conclusion that while petitioner required a total right knee replacement, this was not due to the January 21, 2014 incident but rather to the wear of petitioner's partial knee replacement device and the related progressive arthritis in her knee. The record supports the judge's determination that Dr. DiVerniero's testimony on causation was more credible than Dr. Cataldo's testimony.

### III.

Petitioner argues that the judge erred by accepting Dr. DiVerniero's testimony because the doctor purportedly did not understand the standard for admission of expert medical testimony. He contends the doctor offered personal opinions, not opinions to the "reasonable degree of medical probability." We disagree.

During voir dire, petitioner's attorney asked Dr. DiVerniero whether he understood "the standard that is typically expected of a doctor to testify as an expert in [c]ourt." He replied, "Yes." The doctor indicated he did not know what the standard is called, and petitioner's attorney told him that the standard was "[a] reasonable degree of medical certainty."

Respondent's attorney objected to the question, and the judge stated that the standard was one of probability, rather than certainty. The judge asked the doctor whether his opinions and diagnosis "will be to that standard." The doctor replied, "Yes."

Petitioner's attorney asked Dr. DiVerniero to explain his understanding of the term "a reasonable degree of medical probability." The doctor replied that the phrase means that the statement is truthful to "the best of [his] knowledge and ability."

Petitioner's attorney then asked how that relates "to one's belief in a medical condition or diagnosis?" The doctor responded by stating that his opinions are based on his clinical experience, as well as everything he has learned throughout his fifteen-year career as an orthopedic surgeon, which included his courses in medical school, day-to-day surgeries, and treatment of patients.

Respondent's attorney also questioned Dr. DiVerniero during voir dire. He asked the doctor whether he intended "to express any opinions on the [s]tand that are not accepted generally by the medical community and more specifically by the medical community that [performs] orthopedic surgery." The doctor replied, "No."

Petitioner's attorney moved to bar Dr. DiVerniero's testimony, but the judge denied the motion. The judge noted that Dr. DiVerniero was testifying as one of petitioner's treating doctors. Dr. DiVerniero then testified as discussed previously.

At the conclusion of his direct testimony, respondent's attorney asked if the doctor had given his opinions within a reasonable degree of medical probability, and he replied, "Absolutely."

Thus, the record shows that Dr. DiVerniero offered his opinions on causation in accord with the applicable standard, that is, to a reasonable degree of medical probability. Bondi v. Pole, 246 N.J. Super. 236, 240 (App. Div. 1991) (citing Germann v. Matriss, 55 N.J. 193, 208 (1970)). Furthermore, in his testimony, the doctor indicated that he had a sufficient understanding of that standard. In addition, the doctor stated that his opinions were consistent with those generally accepted by the medical community.

It is well established that when an expert offers an opinion on causation, the expert need not use the phrase "reasonable degree of medical certainty." Eckert v. Rumsey Park Assocs., 294 N.J. Super. 46, 51 (App. Div. 1996) (citing Aspiazu v. Orgera, 535 A.2d 338, 343 (Conn. 1981)). Moreover, the opinion of a medical expert on causation should not be assessed based on "a single verbal straightjacket," but the opinion should be considered in its entirety and admitted if it "reflects an acceptable level of certainty." Id. at 52 (quoting Matott v. Ward, 399 N.E.2d 532, 534 (N.Y. 1979)).

Here, Dr. DiVerniero expressly stated that his opinion was offered to a reasonable degree of medical probability, and it was offered with "an acceptable level of certainty." Ibid. (quoting Matott, 399 N.E.2d at 534). He explained his opinions were consistent with those generally accepted by the medical community. We therefore conclude the judge did not err by admitting and relying upon Dr. DiVerniero's testimony.

IV.

Petitioner further argues that the judge erred by finding her claim is not compensable since Dr. DiVerniero testified that the conditions of her employment were a contributing cause of her need for a total knee replacement.

We note that in her claim petition and motion, petitioner indicated she was seeking medical treatment due to a workplace accident, not an occupational disease. Furthermore, at the hearing on her motion, petitioner's attorney confirmed that this matter involved an accident claim, not an occupational claim.

In addition, petitioner testified that her complaints arose out of the injury she sustained on January 21, 2014. She never claimed the need for the treatment was due to her working conditions. Moreover, petitioner's expert witness, Dr. Cataldo, testified that the full knee replacement was required due to the

14

workplace injury sustained on January 21, 2014, not the conditions of employment.

Petitioner argues, however, that Dr. DiVerniero's testimony supported a claim for treatment resulting from occupational exposure. In his direct testimony, Dr. DiVerniero stated that many "variables" could affect the length of time a partial knee replacement might last. He noted that an individual's weight is one of those factors.

On cross-examination, petitioner's attorney asked the doctor whether the combination of petitioner's weight on the tile floor of the store and her eight-hour shifts could cause the prosthesis to break down sooner than if petitioner had a more sedentary job. The judge noted that petitioner had not filed an occupational claim. The judge also pointed out that no witness had opined "to a reasonable degree of medical probability this was caused by working on a hard tile floor."

The judge observed that Dr. DiVerniero had testified that the age of the knee replacement, walking or doing things at home or at work, or a combination of those factors "would cause wear over time." The judge stated that if petitioner wanted to assert an occupational claim, she should file one.

Petitioner's counsel then asked Dr. DiVerniero whether "given the history, the video that you watched, the conditions that the

A-2859-16T1

petitioner worked in, within a reasonable degree of medical probability[,] could this have been or is this an occupational case?" The doctor replied:

> My answer is no, that this is a combination of multiple variables leading to the normal wear and tear of a prosthesis that actually survived fairly long in this patient. Every patient is different. There [are] different forms of wear in everyone. But this is progressive ongoing wear. Regardless of where she worked, regardless of what activities she did outside of work, it's an ongoing phenomenon of wear.

Petitioner's counsel then asked whether the doctor had agreed that being overweight and working on a tile floor "would contribute to the breakdown of that prosthesis." The doctor replied:

> That's a different question. You said did it contribute, not did it cause. . . . I just said there are multiple variables that contribute, so, yes, I testified that that's one of the variables, but you're trying to make me testify that that is the absolute and only variable, and I'm not going to do it.

Petitioner argues that in order to establish an occupational claim, she need only prove that the working conditions contribute to the condition. She contends Dr. DiVerniero's testimony was sufficient to support a claim of an occupational injury. She asserts that the judge should have amended the pleadings to conform to the evidence and found that the conversion to a total knee replacement was due to a work-related injury.

16

We are convinced, however, that the judge did not abuse his discretion by refusing to treat petitioner's application as an occupational claim. As noted in her petition and motion, petitioner never indicated she was asserting such a claim. Furthermore, respondent did not have notice that petitioner was pursuing an occupational claim, and during the hearing, petitioner presented no expert testimony to support such a claim. The judge properly ruled that if petitioner wanted to assert an occupational claim, she should file one.

Moreover, Dr. DiVerniero's testimony was insufficient to establish a compensable occupational claim. Under the Workers' Compensation Act, a "compensable occupational disease" is defined to include "all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment." N.J.S.A. 34:15-31(a).

"Material degree" is "an appreciable degree or a degree substantially greater than de minimus." Singletary v. Wawa, 406 N.J. Super. 558, 565 (App. Div. 2009) (quoting Peterson v. Hermann Forwarding Co., 267 N.J. Super. 493, 504 (App. Div. 1993)). Therefore, to establish a compensable occupational claim, a petitioner "must show that the alleged occupational exposure

17                                      A-2859-16T1

contributed to the resultant disability by an appreciable degree or a degree substantially greater than de minimus." Ibid. (quoting Peterson, 267 N.J. Super. at 504).

Here, Dr. DiVerniero testified that the fact that petitioner worked standing on a tile floor could have been a contributing factor to the wear of her partial knee replacement. However, Dr. DiVerniero stated that the wear also could have been attributable to petitioner's weight, the age of her prosthesis, and her other physical activities.

Thus, Dr. DiVerniero's testimony did not establish that petitioner's working conditions contributed to her disability by an appreciable degree or a degree substantially greater than de minimus. We therefore reject petitioner's contention that she established a compensable occupational claim in this proceeding.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION